**UNITED STATES**
v.
George **BELL** et al.
Cr. No. 211–54.

United States District Court,
District of Columbia.

Jan. 10, 1955.
Motion to Reconsider Denied
Feb. 15, 1955.

See also, 120 F.Supp. 670.

Leo A. Rover, U. S. Atty., Frederick G. Smithson, Asst. U. S. Atty., Washington, D. C., for plaintiff.

George E. C. Hayes, William B. Bryant, Curtis P. Mitchell, De Long Harris, Henry Lincoln Johnson, Jr., Saul G. Lichtenberg, Washington, D. C., for defendants.

LAWS, Chief Judge.

Eighteen defendants have been charged in a thirty-one count indictment with conspiracy to commit offenses against the United States under 18 U.S.C. § 371, and with violations of the lottery laws of the District of Columbia, D.C.Code, Title 22, §§ 1501, 1502, 1505, 1951 ed., as amended. Before trial they have filed motions to suppress evidence and for return of property, to inspect documents and for statements of witnesses, for severance, for a bill of particulars, and to dismiss the first count of the indictment and for other appropriate relief. At the hearing the motion to dismiss was denied. This opinion deals with the other motions.

### I. Motions to Suppress Evidence and to Return Property

On the basis of a nine-page affidavit by police officers describing their observations of various persons and premises on twenty-eight days between November 16, 1953, and February 1, 1954, there were issued and executed on February 3, 1954, certain arrest warrants and five search warrants for the following premises in the District of Columbia:

41 L Street, N.W. (entire premises), occupied by Bossy Glover;

2126 10th Street, N.W. (entire premises), occupied by Bernie King and Janie E. Owens;

1628 O Street, N.W. (entire first floor), occupied by Jewel C. Miller and Benjamin T. Lewis;

54 M Street, N.W. (basement, janitor's quarters), occupied by Oliver Holsey; and

1304 Gallaudet Street, N.E. (entire premises of Apartment 201), occupied by George Bell.

Defendant occupants of the premises have moved to suppress evidence and for return of property seized under the search warrants, alleging violation of Constitutional rights in that the search warrants were insufficient in law, were improvidently granted, were defective upon their face, were not based upon adequate legal probable cause, and were illegally executed.

It is an unreasonable search and seizure that is condemned by the Fourth Amendment. United States v. Rabinowitz, 1950, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653; Harris v. United States, 1947, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399; Carroll v. United States, 1925, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. The law allows crime to be reached even in the privacy of one's own quarters upon a proper showing. Johnson v. United States, 1948, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436. The test of reasonableness is whether there was probable cause for the search: the facts and circumstances within the officer's knowledge and of which they had reasonably trustworthy information must be sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed. The proper showing required is that which is necessary to satisfy a neutral and detached magistrate, not that of a zealous officer acting under the stress of ferreting out crime. See Johnson v. United States, supra; United States v. Lefkowitz, 1932, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877.

In determining whether there is probable cause for issuance of a search warrant an impartial magistrate is not compelled to ignore what is commonly known to be the usual procedures and operations of offenders in perpetrating

the type of crime alleged. The law does not require that there be legal evidence sufficient for conviction. Brinegar v. United States, 1949, 338 U.S. 160, 69 S. Ct. 1302, 93 L.Ed. 1879; Washington v. United States, 1953, 92 U.S.App.D.C. 31, 202 F.2d 214, certiorari denied 345 U.S. 956, 73 S.Ct. 938, 97 L.Ed. 1377, rehearing denied 345 U.S. 1003, 73 S.Ct. 1130, 97 L.Ed. 1408. The Fourth Amendment does not deny law enforcement officers the support of the usual inferences which reasonable men will draw from evidence. Johnson v. United States, supra. The probabilities involved in probable cause " \* \* \* are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, supra, 338 U.S. at page 175, 69 S.Ct. at page 1310, 93 L.Ed. 1890. The criterion of reasonableness of the search depends upon the particular facts and circumstances—the total atmosphere of the case. United States v. Rabinowitz, supra.

██ This is not a case where overzealous officers have taken matters into their own hands and in the unrestrained exercise of their discretion have invaded the privacy of a residence, rather than pursuing orderly established procedures under the "aegis of judicial impartiality" where full opportunity was present. Cf. United States v. Jeffers, 1951, 342 U.S. 48, 72 S.Ct. 93, 95, 96 L.Ed. 59; McDonald v. United States, 1948, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153; Johnson v. United States, supra. Here the officers did not act recklessly upon mere information, but cautiously established a watch over the activities of the suspect and those who came into contact with him to determine whether a pattern of behavior was disclosed conforming to the customary procedures required in the operation of a numbers lottery. Cf. Mills v. United States, 1952, 90 U.S.App. D.C. 365, 196 F.2d 600, certiorari denied 344 U.S. 826, 73 S.Ct. 27, 97 L.Ed. 643. Their observations and conclusions were submitted in detail under oath for scrutiny by the United States Commissioner, authorized to issue warrants of arrest and search. This in itself is a factor to be considered in testing whether the search was reasonable. See United States v. Rabinowitz, supra.

In this case, the officers had personal knowledge that the janitor's quarters in the basement of 54 M Street, N.W., were being used in the operation of a lottery, an undercover police officer having made a series of number plays there on ten different days with various persons who recorded them in a regular numbers book. A complaint was received by the officers that one Bossy Glover was writing and picking up numbers in the unit block of M Street, N.W., where these quarters were located. On the basis of this knowledge and information, coupled with observations that Glover regularly visited these quarters, as well as other residences on a regular circuit, the officers were justified in concluding Glover was in fact a numbers "pick-up man". This conclusion was fortified by the significance of the time of day, between 1:30 p. m. and 2:30 p. m., when Glover would make his tour, corresponding to the time of day when numbers are customarily picked up. It was Glover's practice to return to his residence at 41 L Street, N.W., after completing these rounds, stay about five minutes, then come out, meet one James Davis, a known numbers operator, a paper bag would change hands or they would drive off together. It is not without reason for the officers to infer that late numbers plays were being received at Glover's home just before the close of the day's operation. Drawing on their experience, the officers could note that pick-up men regularly return the day's winnings to sucessful betters on the next day when other numbers were picked up, indicating they would be kept at the pick-up man's residence until distribution.

The meetings between Glover and Davis were held covertly at different places, obviously by pre-arrangement, and indicate an intent to avoid detection by the police. They also explain the curious be-

havior of Davis, on one occasion after meeting with Glover, when he drove to 11th and O Streets, N.W., parked his car, boarded a bus, alighted at 17th and P Streets, N.W., and then began walking. After their customary meeting, Glover would enter 2126 10th Street, N.W., and Davis 1628 O Street, N.W., at about the same time other known and suspected numbers operators and certain unidentified persons would come together, raising a fair inference these premises were collection and counting centers where the numbers picked up that day were brought together, tabulated and checked against the winning number of the day, and the winnings allocated for distribution on the next day through the writers, collectors and runners. There was significance also in the time of day, between 2:30 and 3:45 p. m., when these persons would assemble, this being the time when operations at the headquarters of numbers operations customarily commence. Cf. McDonald v. United States, supra, 335 U.S. at page 452, 69 S.Ct. at page 192, 93 L.Ed. at page 157; Wyche v. United States, 1951, 90 U.S.App.D.C. 67, 68, 193 F.2d 703, 704, certiorari denied 342 U.S. 943, 72 S.Ct. 556, 96 L.Ed. 702, rehearing denied 343 U.S. 921, 72 S.Ct. 675, 96 L.Ed. 1334.

■ The officers observed that the persons entering or leaving both premises had bulging pockets, or carried paper bags, a large pocketbook, a cardboard box, or the like. On one occasion, a known or suspected numbers operator was observed removing a paper bag from his coat, after he had been walking with hand in coatpocket as if concealing something, just before entering 1628 O Street, N.W. Knowing from experience that numbers collections tend to be bulky, the officers had the right to infer they would be concealed in paper bags, bulging pockets and other parcels and containers. Cf. Mills v. United States, supra, (large paper bag); United States v. Bianco, 3 Cir., 1951, 189 F.2d 716 (large suitcase extraordinary for short trip made); United States v. Johnson, D.C.D.C., 1953,

113 F.Supp. 359 (pocket bulging). See Brinegar v. United States, supra, 338 U. S. at page 163, 69 S.Ct. at page 1304, 93 L.Ed. at page 1884 (automobile believed to be engaged in illicit liquor running observed to be "heavily loaded" and "weighted with something"); Stobble v. United States, 7 Cir., 1937, 91 F.2d 69, 70 ("one-ounce colored envelopes of the character in which heroin is usually packed").

■ The officers, having probable cause to believe both premises were secret hideouts for illegal activities, were justified in inferring that those who entered at the significant time of day were probably participants in the operation of the numbers game. Wyche v. United States, supra; Beard v. United States, 1935, 65 App.D.C. 231, 238, 82 F.2d 837, 844, certiorari denied 298 U.S. 655, 56 S.Ct. 675, 80 L.Ed. 1382; Cantrell v. United States, 5 Cir., 1926, 15 F.2d 953, 954, certiorari denied 273 U.S. 768, 47 S.Ct. 572, 71 L.Ed. 882. The police had a right to believe that George Bell, a suspected numbers operator, was a "pick-up man" by his presence with paper bag at 2126 10th Street, N.W., and because he had been seen going from these premises to his home at 1304 Gallaudet Street, N.E., with paper bag, and a known numbers operator, one Larkin King, had been seen entering and leaving his residence, that in his home there was numbers paraphernalia.

In addition to cases which hold that search warrants may not issue upon mere belief, suspicion, or conjecture, defendants rely upon the opinion of this Court in United States v. Johnson, supra, as requiring that the evidence seized at the various premises be suppressed. In that case, however, the premises searched were the private dwelling of a stranger involved in no way in the operation of a lottery, and there was not present the element of a planned convergence of known and suspected numbers operators. The Johnson case is therefore not in point.

Defendants challenge the accuracy of the affidavit, adverting to certain alleged discrepancies as to the time when the officers made observations of persons and premises as between the affidavits here and the affidavits in three other cases. An examination of the affidavits indicates at most that some of the times were stated as approximations, such as "about 2:40 p. m.". Thus where conflicts in times occur, they fail to reflect upon the veracity of the officers and are not materially significant in testing the correctness of the affidavit.

 Defendants allege that the observations were begun as a result of evidence illegally seized on October 20, 1953, from Barbara Towles and James Shay and suppressed in another case in the Court, and therefore evidence seized under the search warrants here, as the "fruits of a poisonous tree", must likewise be suppressed. Nardone v. United States, 1939, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307. While evidence illegally acquired may not be used in any way, the officers may use any information and knowledge gained from independent sources. Silverthorne Lumber Co. v. United States, 1920, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319; Coplon v. United States, 1951, 89 U.S.App.D.C. 103, 191 F.2d 749, certiorari denied 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690. Here the affidavit of the police officers, as well as their testimony at the hearing, show that the observations were begun as a result of a complaint that Bossy Glover was picking up numbers, information that was independent of the evidence suppressed at the earlier motion.

 Defendants also maintain, granting the search warrants were legally issued, that they were illegally executed in that the searches were executed in the nighttime although the officers did not have positive knowledge the property was concealed on the premises. Rule 41(c), Federal Rules of Criminal Procedure, 18 U.S.C. The return on the warrants show some of them were executed at 6:00 p. m. on February 3, 1954.

Evidence introduced by defendants show that sunset occurred on that date at 5:31 p. m. The officer executing the warrant testified that the search began about 4:30 p. m. in the daytime, but, because of the varied character and large amount of property seized, the inventory was not completed until 6:00 p. m. in the nighttime. It was sufficient that the search began in the daytime although it continued after dark. Just as it was necessary to introduce evidence to determine whether it was a day or night search, so evidence to explain whether the time stated in the return was the time when the search began or when it ended was likewise admissible. The Court accordingly finds the warrants were not illegally executed.

 The Court concludes, in the light of the particular circumstances of the case from the facts set forth in the affidavit, that the police officers had probable cause to believe, through personal contact, knowledge, observation and information that the premises for which the search warrants were issued were being used for the operations of a numbers lottery and that evidence of crime was there concealed. Defendants' motions to suppress evidence and to return property will be denied.

II. Motions to Inspect Documents and for Statements of Witnesses

 Under the opinion of the United States Court of Appeals for the District of Columbia Circuit in Fryer v. United States, 1953, 93 U.S.App.D.C. 34, 207 F.2d 134, certiorari denied 346 U.S. 885, 74 S.Ct. 135, rehearing denied 346 U.S. 928, 74 S.Ct. 305, defendants are entitled to inspection before trial of documents and statements which are or may become evidence. The work product of Government counsel consisting of unsigned narrative statements prepared in the office of the United States Attorney as to what prospective witnesses are expected to testify is not evidence. Signed reports of investigators are not evidence and may not become evidence except as to recitals of facts as to which

the party signing the report has personal knowledge. Notes made by one employed by the District Attorney are available either as direct or impeaching evidence where there is a showing they have been adopted by a witness by signature or otherwise.

 The Court has examined the material in the possession of the prosecution. Two statements signed by Officer Jefferson consist of observations made by him. A third statement of facts is signed by Detective Southcomb, but only the last two paragraphs concern activities upon which he could testify, the rest of the statement consisting of hearsay as to the activities of another officer. The Government will permit defendants to inspect the statements of Officer Jefferson and the last two paragraphs of the statement of Detective Southcomb.

### III. Motions for Severance

Defendants have moved for severance on the grounds of misjoinder of defendants and counts, and prejudice in the grouping of miscellaneous gaming charges lending a false color to the conspiracy count by virtue of the similarity of otherwise disconnected crimes. Generally persons jointly indicted should be tried together, and the granting of separate trials rests within the exercise of a sound discretion by the Court. Here the counts are all directed to an alleged interwoven pattern of behavior in a complex operation of a numbers lottery. Defendant's motions for severance will be denied.

### IV. Motions for Bill of Particulars

The Government is not required to make a complete discovery of its entire case by a bill of particulars. The indictment here sufficiently advises defendants of the specific acts of which they are accused, so that they may properly prepare their defense and avoid surprise at trial, and protects them against double jeopardy. Moreover, the affidavit in support of the search warrants issued in this case gives much information to defendants. The motions for bill of particulars will be denied.

The Court accordingly will deny defendants' motions to suppress evidence and for return of property, grant in part and deny in part, as indicated above, the motions to inspect documents and for statements of witnesses, and will deny the motions for severance and for bill of particulars.