UNITED STATES

v.

Sam SIMS, Jr.

Cr. No. 13042.

United States District Court
M. D. Tennessee,
Nashville Division.

Jan. 16, 1962.

Joseph L. Lackey, Jr., Asst. U. S. Atty., Nashville, Tenn., Kenneth Harwell, U. S. Atty., Nashville, Tenn., of counsel, for plaintiff.

Robert E. Lillard and A. A. Birch, Jr., Nashville, Tenn., for defendant.

GRAY, District Judge.

This is a prosecution for conducting a lottery without registering and paying tax as required by the Internal Revenue Code, Sections 4401, 4411, 4412 and 6011, 26 U.S.C.A. §§ 4401, 4411, 4412, 6011, and in violation of Sections 7203 and 7262, 26 U.S.C.A. §§ 7203, 7262. Trial by jury was waived.

The defendant, who rested without presenting any evidence, now renews by motion for judgment of acquittal at the close of all the evidence all questions previously raised in his amended pre-trial motion to suppress evidence and his motion for judgment of acquittal at the close of the government's case. Counsel have submitted the case on briefs.

The prosecution is based upon evidence obtained from the defendant's home September 28, 1960, under a search warrant issued the previous day. The warrant was issued by the United States Commissioner on the basis of an affidavit executed by F. C. Smith, a special agent of the Internal Revenue Service, partially on a printed form and partially on two attached sheets of paper. In the space provided for the defendant's name on the printed form, Agent Smith entered only a street address with a parenthetical reference to the more detailed description of the premises in the body of the affidavit. This more detailed description disclosed that the address was that of a dwelling house with a rural type mail box bearing the name, "S. S. Sims." In the course of his account on the attached sheets, the officer referred to the house as the "Sims dwelling."

The two attached sheets, together constituting "Attachment #1," contain the facts the officer relied upon as supporting his belief that lottery paraphernalia could be found in the dwelling. The text of the attachment is set out below.[1] The

1. "ATTACHMENT #1

"On or about August 11, 1960 I was requested by Special Agent John Anderson to assist in the surveillance of a suspected lottery bank at the place and address described above.

"On September 8, 1960 I was observing the above described property from a bench on the porch of a small store approximately 200 feet away at 9:02 a. m., A black Mercury Station Wagon bearing Tennessee license tax No. 1X 3856 turned into the driveway of Sims residence and parked in the carport, the driver got out of the car and entered the dwelling. From where I was sitting I could not see if he was carrying anything.

"On the afternoon of this same date I deliberately stalled my car in front of Sims dwelling and pretended to work on the engine, at 2:10 p. m. a light colored 1960 Chevrolet bearing Tennessee license plates No. 1X 3858 drove into the carport of Sims home. The driver, a slim young negro wearing a horizontal striped knitted shirt and dark pants got out of the car, took a brown paper sack from the seat of the car and entered the side door of the residence.

"On September 9, 1960 I was parked at the first intersection west of the bridge in Bordeaux at 2:03 p. m. the light colored Chevrolet, previously described passed. The driver was the same person observed the previous day. I followed this car to Sims residence where the driver parked in the carport, next to the black Mercury station wagon already there. The driver took a brown paper sack from the seat and entered the residence.

"I then returned to the intersection at Cumberland High School and Hydes Ferry Road. As I turned into the intersection, a 1960 green Oldsmobile, Tennessee license #1X3857 passed going west on Hydes Ferry Road; the driver was the same heavy build negro that I had seen driving this car before. I had also seen him driving a black Mercury station wagon, license #1X3856.

"I followed this car until it turned into the driveway of 3807 Hydes Ferry Road. The driver took a brown paper sack from the seat of the car and entered the house.

"On September 23, 1960 at 8:45 a. m. I drove to the vicinity of Johnsons Variety Store, a suspected lottery drop. I observed the green Oldsmobile license #1X 3857 parked across the street from the store. I then proceeded to an intersection just across the Bordeaux Bridge. I had been there only a few minutes when the green Oldsmobile, driven by the heavy build negro I have previously described passed. He was accompanied by a slim young negro in white cap, dark glasses and checkered shirt. I followed the car until it turned into the driveway of the Sims residence and parked in the carport. Both occupants got out, the slim negro had a bag in his hand.

"In the afternoon of September 23, 1960, I was parked in the 700 block of Eighth Avenue South, Nashville, Tennessee at a point that I could see the front of Johnsons Variety Store at 625— Eighth Avenue South, a suspected lottery drop. I could also observe the white Chevrolet, Tennessee license #1X 3858, parked across the street from the store. At 1:45 p. m. a negro who I had seen previously driving an M.G. auto crossed the intersection of Seventh Street and Eighth Avenue carrying a small box and entered Johnsons Store.

"At 1:52 the young negro, wearing a white cap, dark glasses and walking shorts who had been described as a passenger in the green Oldsmobile that morning, came out of Johnsons Variety Store. He was carrying a brown paper bag in his left hand. He got into the white Chevrolet and drove north on Eighth Avenue. I attempted to follow him, but lost him in the traffic. I proceeded to the traffic light at Bordeaux and waited. At 2:17 p. m. the white Chevrolet passed, driven by the same person previously described. I followed at a distance. He parked in the right hand side of the carport, took a paper bag from the front seat and entered the house.

"Based upon my personal experiences, as a special agent, relating to the operations of various types of lotteries, the regular pattern of daily entering and leaving of the premises at 3807 Hydes Ferry Road, Nashville 8, Tennessee by the men described and the times of arrival and departure by these men—8:00 to 9:30 a. m. and 1:00 until 2:30 p. m. coincides with the usual daily drawings of a lottery.

"On September 26, 1960 I personally searched the records of the District Director of Internal Revenue, Nashville.

pertinent facts to be gleaned from the attachment may be summarized thus:

1. Another special agent asked Agent Smith on August 11, 1960, to *assist* in watching the defendant's dwelling.

2. Somebody had classified the dwelling as "a suspected lottery bank" on some basis not disclosed in the affidavit.

3. Agent Smith also had occasion to watch a place known as "Johnson's Variety Store," which somebody had classified as "a suspected lottery drop," again without disclosure of the basis of the classification.

4. The first incident the officer included in his affidavit occurred nearly a month after he was asked to assist in watching the house.

5. The officer observed the movements of from two to four different persons in three different automobiles bearing consecutive license numbers in six incidents—two incidents on each of three different days.

6. These incidents occurred on the morning and afternoon of September 8, the afternoon of September 9, and the morning and afternoon of September 23.

7. Each incident involved the arrival of a single automobile at the dwelling, and in five of the cases the person entering the house carried a bag or sack described, if at all, only as being of brown paper.

8. The agent observed the last two arrivals shortly after having observed the same automobiles parked across the street from the variety store.

9. In the officer's opinion (based on his "personal experiences, as a special agent"), these incidents formed a "pattern of daily entering and leaving" the premises at hours coinciding "with the usual daily drawings of a lottery."

10. No registration had been made or wagering tax stamp issued for that address.

If the strongest parts of this evidence be taken out of context, it might be possible to suppose that the agent had received information that the house was a lottery bank and the variety store a lottery drop, and that he had investigated and found a consistent pattern of activity that, in his expert opinion, was so clearly that of a numbers operation as to negate the possibility of coincidence. But, as the government correctly points out in its brief, the affidavit must be read as a whole.

■ First, the character and source of the information on which Agent Smith and the officer he was assisting began their investigation were not disclosed. The classification of the house as a suspected lottery bank and of the store as a suspected lottery drop adds nothing to the obvious implication of any search warrant affidavit of this kind that investigation was undertaken because somebody had become suspicious. If the grounds on which the suspicion was based had been of probative value they should have been stated in the affidavit. If the basis of the suspicion had no probative value, the suspicion itself has none. International Paper Co. v. United States, 227 F.2d 201, 205 (5th Cir. 1955).

■ Second, six isolated incidents of persons entering the house, each innocent in itself, scattered over a period of more than two weeks in the course of an investigation lasting seven weeks can hardly be said to have established a "pattern of daily entering and leaving" from which a further inference of criminal activity might have been drawn, even by an expert. The affidavit does not state that the three days on which the incidents occurred were the only three days during which surveillance was made of the house. If this were the actual case, it would be more persuasive that a pattern of daily entering and leaving had been established. In the absence of such a

Tennessee for all wagering tax stamps issued in the State of Tennessee for the period July 1, 1960 to September 26, 1960. I found no record of the registration or issuance of a wagering occupa-

tional tax to any one listing the premises at 3807 Hydes Ferry Road, Nashville, Tennessee as a business or residence address.

"F. C. Smith"

statement, however, from the dates shown in the affidavit as to the beginning of the surveillance and of its conclusion, the inference must be drawn that these were not the only days on which surveillance was had but the only days on which incidents occurred which were deemed worthy of including in the affidavit. On the trial, the agent testified that he knew the defendant, Sam Sims, Jr., at the outset of the investigation; that the defendant was one of the persons described in the affidavit; further, it was shown that the defendant had previously held a wagering tax stamp but did not have one during the period involved. None of these facts are stated in the affidavit and, of course, subsequent testimony cannot be used to bolster such an affidavit. Baysden v. United States, 271 F.2d 325 (4th Cir. 1959).

■ Third, the affidavit discloses that the affiant was merely assisting in watching the house, yet there is no affidavit from the officer he was assisting. If the government should fail to produce an important witness available to it in a full adversary proceeding, a presumption would arise that the witness's testimony would be unfavorable. United States v. Di Re, 332 U.S. 581, 593, 68 S.Ct. 222, 92 L.Ed. 210 (1948). In an *ex parte* proceeding involving so fundamental a matter as the citizen's right to be secure in his home against arbitrary incursions of the police, the same principle should have some application, particularly when the government seeks to base probable cause on a mere pattern formed by otherwise innocent activity.

Fourth, even if some sinister inference or other might have been drawn by the Commissioner from this affidavit, the question remains whether he was authorized to draw the further inference that the activity necessarily involved the concealment on these particular premises of property subject to seizure under Rule 41(b) (2) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. This rule authorizes warrants to search for and seize property "Designed or intended for use or which is or has been used as the means of committing a criminal offense." Yet this affidavit is innocent of any allegation showing that the activity alleged necessarily required any property as a means of its commission, or that, even if it did, the property would probably be concealed here rather than, say, at Johnson's Variety Store. The only items the officer mentioned that might have been in the house were brown paper bags of undisclosed size, shape, or significance. There is no indication whether these bags were brought out again since no description of departures was offered.

Both parties cite passages from the case of United States v. Ramirez, 279 F.2d 712 (2nd Cir. 1960), but the case is not very helpful. That case concerned a search for property the very possession of which was a crime and it therefore used language indicating that a showing of probable cause to believe a crime had been committed would be sufficient to authorize the issuance of a search warrant. This, of course, may be true where the crime involved is possession itself, because the location of the property is often established by the same facts that show the commission of the crime of possessing it. In the present case the property sought would be contraband under federal law only if used to violate a tax law. Its possession would be significant in this court only as evidence tending to establish the commission of crimes other than mere possession.

The case of United States v. Price, 149 F.Supp. 707 (D.D.C.1957), is more helpful. There the officers had obtained clear proof of numbers activity by placing bets with a writer at a certain address and then following him to another address on seven out of eight days. The court granted a motion to suppress evidence obtained under a search warrant for the second address. The following quotation from that opinion tends to throw some light on the factors to be considered in the present case:

> "This is not a case in which groups of known or suspected numbers operators collected at the premises, as in Woods v. United States, 99

U.S.App.D.C. 351, 240 F.2d 37, affirming Bell v. United States, D.C. 1955, 126 F.Supp. 612 in this respect. Nor is it a case in which groups of people arrived at the premises with bulging pockets or carrying paper bags and left soon thereafter with empty pockets and unencumbered by bags, as in Wyche v. United States, 1951, 90 U.S. App.D.C. 67, 193 F.2d 703, certiorari denied 342 U.S. 943, 72 S.Ct. 556, 96 L.Ed. 702. Nor is it a case in which the police, having reliable information that the *premises* were being used illegally, conducted an investigation as to those premises, by telephoning there on several occasions and receiving numbers information from a man previously identified to them as a numbers operator, as in Washington v. United States, 1953, 92 U.S.App.D.C. 31, 202 F.2d 214, certiorari denied 345 U.S. 956, 73 S.Ct. 938, 97 L.Ed. 1377.

"In the instant case the police received no reliable information as to the premises, conducted no surveillance or investigation thereof with the exception of determining the owner, and in fact, observed nothing suspicious about the premises. So far as the affidavit indicates and so far as the Court is aware, the police investigation was limited strictly to the activities of one numbers writer, and even that investigation did not disclose any observable evidence that that writer was obtaining from, or depositing at, the premises any numbers material whatsoever." 149 F.Supp. at 709.

In the case now before the court there was no definite statement of information as to numbers activity anywhere, no uninterrupted trailing of anybody from one address to another, no definite identification of any person as a numbers writer, and no steady watching day after day. These differences from the Price case emphasize the additional weaknesses of the affidavit in the present case.

The government relies, as the court did when this issue was first raised in the pre-trial motion, upon the case of Merritt v. United States, 249 F.2d 19 (6th Cir. 1957). That case appears on first reading to give commissioners a very broad scope of discretion in interpreting affidavits and granting or refusing search warrants. On further consideration, however, it is clear that the rationale of that case will not stretch to cover this one, nor has the court's attention been called to any other case that does go so far. In Merritt the court emphasized that the building involved was

"an abandoned grocery building in which there were no grocery displays and in which the only activity was the resort to the building by defendants at the two regular times of day normally used for checking wagers and profits in the numbers business. There being no evidence of a legitimate use of the premises, the Commissioner had probable cause to believe that a numbers operation was being carried on." 249 F.2d at 21

This clearly implies that if the grocery store were operating legitimately something more might have been required. *A fortiori*, a stronger pattern would be needed to authorize the search of a private dwelling presumably occupied as such. Yet the details on which it is sought to establish a pattern here are, at best, far scantier than those before the court in Merritt.

■ This affidavit clearly did not present facts from which the Commissioner could properly have made a finding of probable cause for issuance of the warrant, and the evidence obtained under the warrant should have been suppressed.

Since the government's case, none too strong at best, disintegrates entirely without this evidence, the motion for judgment of acquittal must be granted and it will be unnecessary to discuss the other questions presented.

Accordingly, a judgment of acquittal will be entered and the defendant will be discharged.