James W. HARLOW, Charles E. Wilson and Thomas F. Addy, Appellants,

v.

UNITED STATES of America, Appellee.

No. 18865.

United States Court of Appeals Fifth Circuit.

April 4, 1962.

Rehearing Denied April 30, 1962.

3. Appellants also rely to some extent on Anderson v. Commissioner, 10 Cir., 1936, 81 F.2d 457, 104 A.L.R. 676, a similar case, except for the fact that Anderson, unlike the taxpayer here who was simply commuting from one business to the other, was engaged in carrying on one of his businesses when the accident occurred.

Trueheart, McMillan, Russell & Westbrook, San Antonio, Tex., for appellant James W. Harlow.

James R. Gillespie and Glenn B. Lacy, San Antonio, Tex., for appellant Charles E. Wilson.

Joel W. Westbrook, San Antonio, Tex. (appointed by this Court), for appellant Thomas F. Addy.

Russell B. Wine, U. S. Atty., San Antonio, Tex., Wm. A. Paisley, J. Frank Cunningham, Attys., Dept. of Justice Washington, D. C., for appellee.

Before TUTTLE, Chief Judge, and RIVES and WISDOM, Circuit Judges.

TUTTLE, Chief Judge.

The three appellants are former civilian employees of the European Exchange System (EES) which was established to operate various facilities, including the well-known military Post Exchanges, for the benefit of United States servicemen and other authorized personnel stationed in Europe. The appellants have

been convicted of certain offenses relating generally to their alleged participation in a scheme involving the solicitation and receipt of bribes and kickbacks from certain vendors to the EES.

The indictment was returned against appellants on April 19, 1957. The first count charged them with the conspiring amongst themselves and with "other persons to the grand jury unknown"[1] to defraud the United States, in violation of 18 U.S.C.A. § 371:[2]

"One: Of and concerning its rights to have the business affairs, activities and functions, of the said European Exchange System, honestly and efficiently administered, exercised and performed, free from unlawful impairment, obstruction, or corruption, and collusion between employees of said agency and persons seeking to sell food products and other merchandise to said agency.

"Two: Of and concerning its right to have contracts for the purchase of foodstuffs and other merchandise, which were entered into by EES, awarded in accordance with the established procedures and in an honest and businesslike manner, free from the solicitation and acceptance of money by the employees of said EES from persons, firms and corporations, as bribes, kickbacks, commissions or otherwise.

"Three: Of and concerning its right to conscientious, faithful and honest services, decisions, actions and performances of the duties of its employees in said EES, free from corruption, partiality, improper influence and dishonesty, and from the solicitation or acceptance of money and things of value by its said employees from persons, corporations, and firms engaged in selling and endeavoring to sell foodstuffs and other merchandise, products and property to the said EES."

The second and third counts of the indictment charged the appellant Wilson with soliciting bribes on two occasions from Robert T. McLane, a representative of firms selling to the EES, in violation of 18 U.S.C.A. § 202.[3] Counts four through nine charged the appellant Harlow with receiving bribes from Robert T. McLane and Henrik Emborg (also a representative of suppliers to the EES), in violation of 18 U.S.C.A. § 202.

The appellants were convicted as charged on June 16, 1960, in the United States District Court for the Western District of Texas, San Antonio Division. Judgments were entered and sentences

---

1. The indictment also named one Paul Port as a co-conspirator, but Port died prior to the trial.

2. "§ 371. Conspiracy to commit offense or to defraud United States.
 "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both." 18 U.S.C.A. § 371.

3. "§ 202. Acceptance or solicitation by officer or other person.
 "Whoever, being an officer or employee of, or person acting for or on behalf of the United States, in any official capacity, under or by virtue of the authority of any department or agency thereof, or an officer or person acting for or on behalf of either House of Congress, or of any committee of either House, or of both Houses thereof, asks, accepts, or receives any money, or any check, order, contract, promise, undertaking, obligation, gratuity, or security for the payment of money, or for the delivery or conveyance of anything of value, with intent to have his decision or action on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity, or in his place of trust or profit, influenced thereby, shall be fined not more than three times the amount of such money or value of such thing or imprisoned not more than three years, or both, and shall forfeit his office or place and be disqualified from holding any office of honor, trust, or profit under the United States." 18 U.S.C.A. § 202.

imposed on February 14, 1961. This appeal followed.

Before discussing the numerous and varied contentions urged by the appellants, it would be well to describe briefly the scheme of corruption which the Government attempted to establish. In 1950, Harlow was Chief of the Food and Services Branch of the EES in Germany. In this capacity he possessed authority to negotiate for the purchase of various supplies and services by the EES from vendors throughout Europe. Appellant Wilson was Harlow's assistant; appellant Addy was the EES Chief of Security. Very simply, the Government sought to prove that the appellants and other civilian employees of the EES, known collectively as "the organization," induced certain vendors to pay them for the privilege of doing business with the EES. Those who paid were rewarded with contracts to supply the EES; those who did not received less favorable action on their bids. Bribe payments were allegedly channelled to the members of "the organization" through certain numbered bank accounts which "the organization" had established with various banks in Switzerland. This lucrative scheme is supposed to have continued from 1950 through 1953, at which time "the organization" was exposed and its illegal operations brought to a halt by the authorities.

The first contention pressed by the appellants is that the trial court abused its discretion in refusing to dismiss the indictment on the ground that the Government "prejudiced appellants' ability to prepare for trial by deliberate and unwarranted delay in bringing the case to trial." The argument here is that the Government had sufficient information to try appellants as far back as 1953, and that the failure of the Government to bring them to trial until June, 1960, prejudiced their defense because various witnesses and records which might have aided their defense became unavailable during the seven year delay. We find no merit in this claim.

■ It is well established that the right to a speedy trial guaranteed by the Sixth Amendment and implemented by Rule 48(b) of the Federal Rules of Criminal Procedure, 18 U.S.C.A.[4] does not arise until after a prosecution is instituted against the accused. Any delay occurring between commission of the offense and commencement of prosecution is controlled exclusively by the applicable Statute of Limitations. Hoopengarner v. United States, 6 Cir., 270 F.2d 465. In the instant case, criminal proceedings were formally initiated against the appellants when the indictment was returned against them on April 19, 1957. Since the indictment was returned within the allowable statutory period,[5] the only delay of which appellants might complain is the delay between the date the indictment was returned [i. e. April 19, 1957] and the date they were brought to trial [i. e. June 6, 1960].

■■ There are two reasons why appellants cannot succeed in their claim that they were denied a speedy trial. First, we do not think that the delay could be characterized as "unnecessary" or "unreasonable." Prior to April, 1957, and up to about April, 1959, the Govern-

---

4. Rule 48(b) provides:
 "If there is unnecessary delay in presenting * * * to a grand jury or in filing an information against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment information or complaint."

5. The conspiracy stated in count one of the indictment was alleged and proven to have continued through 1953, and various overt acts in furtherance of the conspiracy were alleged and proven to have been committed in 1953. The substantive offenses stated in counts two and three were alleged and proven to have been committed in 1953, and the offenses stated in counts four through nine were alleged and proven to have been committed between June and November, 1952. The period of limitations for all the offenses charged in the indictment is five years. 18 U.S.C.A. § 3282. The indictment returned on April 19, 1957, was, therefore, timely.

ment was making a bona fide and vigorous effort to gather information about the Swiss bank accounts. These accounts played a primary role in the alleged conspiracy, and information concerning them was necessarily important to the Government's case against the appellants. Though the Government's effort ultimately proved fruitless, due to the unwillingness of the Swiss authorities to divulge any information about the bank accounts, this does not mean that the time spent trying to obtain this evidence constituted unnecessary and unreasonable delay. See Foley v. United States, 8 Cir., 290 F.2d 562. Appellants were arraigned soon after the Government learned that the information concerning the bank accounts would not be forthcoming. From that time until the trial, a period of about one year, the appellants made various discovery motions. This later delay, therefore, resulted from their own actions, and they cannot now complain that it was unnecessary and unreasonable. United States v. Lustman, 2 Cir., 258 F.2d 475, cert. denied 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109.

Furthermore, even if the delay was unreasonable, appellants would be in no position to complain of it, since they never demanded an earlier trial. It is undisputed that the Government would have and could have gone to trial prior to June, 1960, if the appellants had so requested, despite the continuing unavailability of the information regarding the Swiss bank accounts. But appellants never complained of the delay until they made their motions to dismiss when the time for trial had arrived. The settled rule in the federal courts is that, under such circumstances, the appellants waived their right to challenge the legality of the Government's delay in bringing them to trial. United States v. Lustman, supra.

The appellants next contend that the conspiracy count should have been dismissed on the ground that it was too "vague and indefinite." This argument is likewise without merit. The indictment, in substance, charged the appellants with conspiring with "others" to defraud the United States of its right to have its European Post Exchanges honestly administered by agreeing to receive bribes from McLane, Emborg "and others" with respect to the sale of foodstuffs and "other merchandise" by these vendors to the EES. The gist of appellants' argument here is that the indictment should have specified the "other conspirators," and "other vendors" and the "other merchandise." We do not think such specificity was required. The indictment provided appellants with adequate information to prepare their defense. It outlined the general scope of the conspiracy and charged that it was part of the conspiracy that appellants would cause vendors or agents of vendors who were supplying merchandise to the EES to pay money into numbered bank accounts in Switzerland for the benefit of appellants. Numerous overt acts in furtherance of the conspiracy were detailed. A bill of particulars voluntarily submitted by the Government set forth (1) that McLane and Emborg were the agents of vendors alleged to have been induced to pay bribe money; (2) the numbers of the numbered bank accounts; (3) the name and location of the banks; (4) the dates and amounts of money so paid; (5) the names and addresses of the vendors represented by Emborg and the type of foodstuffs sold by them; (6) the manner in which the appellants caused the bribe money to be deposited in the numbered accounts; and (7) the vendors represented by McLane. Moreover, since the Government did not attempt to prove transactions with vendors or agents of vendors other than McLane and Emborg or transactions relative to the sale of merchandise other than foodstuffs,[6] it is apparent that appellants were not seriously preju-

---

6. There is one significant exception to this statement which will be discussed below in connection with the Government's attempt to establish appellant Addy's participation in the conspiracy.

diced by the indictment's reference to "other vendors" and "other merchandise." The failure of the Government to call any "other conspirators" or "other vendors" as witnesses against the appellants similarly negatived any chance of serious prejudice to appellants. In short, though the references to "other conspirators," "other vendors" and "other merchandise" may have rendered the indictment somewhat vague and uncertain, we are satisfied that this did not deprive the appellants of any substantial right.[7]

We now reach appellant Addy's contention that there was insufficient evidence to support the jury's verdict that he was a participant in the conspiracy charged in count 1 of the indictment. The Government apparently conceded that the indictment would be insufficient as to the appellant Addy if it merely charged him with conspiring with persons *other than* appellants Wilson and Harlow to solicit and receive bribes from vendors or agents of vendors *other than* McLane and Emborg. In other words, the Government admits that the substance of the charge against Addy is that he was a participant in a conspiracy involving Harlow and Wilson, whereby these appellants agreed to defraud the United States by receiving bribes from McLane and Emborg. Thus, if there is no competent evidence linking Addy with the activities of the other appellants, Addy's conviction must be overturned. We think there is no such competent evidence.

 Some time in 1951, the highest authorities in the EES began to suspect that EES employees were soliciting and receiving bribes from vendors to the EES. In or about July, 1952, appellant Addy was first suspected of complicity in the bribery scheme. In order to expose this scheme, it was decided that two EES agents, namely, Bray and Stewart, would attempt to work their way into "the organization" through Addy. Bray and Stewart thus approached Addy and attempted to interest him in the possibility of taking bribes from vendors to the EES. Bray and Stewart testified that Addy went along with their suggestions and that arrangements were made and carried out whereby Bray, Stewart and Addy engaged in the solicitation and receipt of bribes from various vendors. None of these transactions, however, involved Wilson and Harlow, on the one hand, or McLane and Emborg on the other; and, although the testimony of Bray and Stewart indicates that Addy was aware of "the organization" and its activities, there is no competent testimony showing that Addy was in fact a member of "the organization." The only evidence on this point is the testimony of McLane to the effect that Harlow and Wilson told him on various occasions that Addy was a member of "the organization." But this was obviously hearsay as to Addy, and it was incompetent to link Addy with the main conspiracy charged in count one of the indictment. Montford v. United States, 5 Cir., 200 F.2d 759. At most, the Government established the existence of two separate conspiracies, one involving Harlow and Wilson and possibly others, and the other involving Addy, Stewart and Bray.[8]

---

7. This discussion should also dispose of the contentions that the trial court erred in refusing to permit the appellants to examine the grand jury's minutes and in refusing to compel the Government to submit a second bill of particulars. The indictment itself and the bill of particulars voluntarily submitted by the Government provided appellants with adequate information to conduct their defense. We are also of the opinion that appellants were not seriously prejudiced by the Government's apparent failure to produce certain documents in accordance with the trial court's order that it produce all documents in its possession which it had received from McLane and Emborg. The Government substantially complied with this order. The documents which were not produced were not of such significance as to make their non-production, and the consequent inability of defense counsel to examine them before trial, a ground for reversing appellants' convictions.

8. Because of the view which we take of the case, it is unnecessary to consider whether appellant Addy could successful-

Since the Government attempted to establish Addy's guilt on the basis of his assumed participation in a conspiracy with Harlow and Wilson, it would be manifestly unjust to permit Addy's conviction to stand on the ground that it was proved that he had conspired with Bray and Stewart. Especially is this true when considered in light of the fact that the indictment and bill of particulars failed to disclose even the haziest outlines of a conspiracy between Addy, Stewart and Bray to solicit and receive bribes from vendors other than McLane and Emborg. We conclude, therefore, that appellant Addy's conviction should be reversed for lack of evidence.

▪ Assuming the existence of two separate conspiracies, appellants Harlow and Wilson claim that this requires us to hold that there was a fatal variance between the proof, which showed two conspiracies, and the indictment, which charged only one conspiracy. But this Court has already held that:

> "If more than one conspiracy was proved, of at least one of which the appellant was guilty, it is clear that there was no variance affecting his substantial rights." Jolley v. United States, 232 F.2d 83, 84, 88, 5 Cir.

The evidence of Harlow's and Wilson's participation in the main conspiracy is overwhelming. Thus, the variance, if any, could not "affect [their] substantial rights."

Appellants Harlow and Wilson contend that the substantive counts of the indictment (i. e. counts two through nine) charging them with violations of 18 U.S.C.A. § 202 should have been dismissed (1) on the ground that venue was improperly laid in the District Court for the Western District of Texas; (2) on the ground that, as civilian employees of the EES, they do not come within the purview of 18 U.S.C.A. § 202; and (3) on the ground that there was insufficient evidence to justify submission of the question of their guilt to a jury. We think all these contentions must fail.

▪ (1) The Government sought to lay venue in this case in the Western District of Texas under 18 U.S.C.A. § 3238. That section reads as follows:

> "§ 3238. Offenses not committed in any district.
>
> "The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district where the offender is found, or into which he is first brought."

Each of the substantive counts alleged that the offenses were committed out of the jurisdiction of any particular state or district and that the appellants, since the commission of the offenses, had returned to the United States and, on the date of the return of the indictment, were found in the Western District of Texas.[9] Appellants contend, however, that the offenses were not committed out of the jurisdiction of "any particular state or district"; they claim that the territory occupied by the United States in Germany and governed by the United States High Commissioner for Germany was a "district" within the meaning of Section 3238, that the former United States Court of the Allied High Commission of Germany had jurisdiction over this "district," and that the offenses were committed within this "district." They conclude from this that the High

---

ly contend that he was "entrapped" into the conspiracy with Bray and Stewart.

9. Appellant Harlow contends that the allegations of counts five through nine were not sufficient to establish venue in the Western District of Texas under Section 3238 because there was no specific allegation that the offenses charged therein were committed "out of the jurisdiction of any particular state or district."

These counts, however, did expressly allege that the bribe money, at Harlow's request, was deposited in a certain numbered bank account in Switzerland. We think this was sufficient to establish that the offenses involving the "receipt" of bribe money were committed in Switzerland, which is, of course, "out of the jurisdiction of any particular state or district."

Commission Court had exclusive jurisdiction to try them for the offenses charged in the indictment.

■ We cannot agree. Since Section 3238 has been the subject of infrequent litigation, there is scant precedent to guide us in resolving the issue raised by appellants' argument. That issue, simply stated, is whether the German occupied territory under the jurisdiction of the High Commission Court was a "district" within the meaning of Section 3238. We think that it was not. In our view, territory governed by the United States is not a "district" under Section 3238 unless the court having jurisdiction over that territory is invested with the same power as ordinary district courts to try offenses made such by laws of Congress. We cannot believe that Congress meant to preclude the district courts from exercising jurisdiction over an offense against the laws of the United States simply because the acts constituting the offense were committed within the territorial jurisdiction of a military or quasi-military tribunal deriving its authority from the United States Government, but having no power to punish those acts as an offense against the laws of the United States. United States v. Newth, 9 Cir., 149 F. 302. The High Commission Court did not have jurisdiction to try appellants for violating Section 202 of 18 U.S.C.A., though it had the power to punish them if their acts transgressed the laws of the Allied High Commission or the laws of the occupied territory.[10] Under these circumstances, we think that the "offenses" charged in the present indictment were committed outside the jurisdiction of "any particular state or district" and that venue was therefore properly laid in the District Court for the Western District of Texas under 18 U.S.C.A. § 3238.

■ (2) 18 U.S.C.A. § 202, in substance, makes it a crime for any "employee of, or person acting for or on behalf of the United States, in any official capacity, under or by virtue of the authority of any department or agency thereof" to solicit or receive bribes. Appellants Harlow and Wilson claim that a civilian employee of EES is neither an "employee of" the United States nor a "person acting for or on behalf of the United States," so as to come within the prohibitions of Section 202. We think otherwise.

Appellants' argument in this regard is bottomed on two facts; first, that their employment contracts with the EES specifically stated that an EES employee is "not considered to be a Federal employee," and second, that EES is a nonappropriated funds activity, the employees of which, under 5 U.S.C.A. § 150k, are not "considered as employees of the United States for the purpose of any laws administered by the Civil Service Commission or the provisions of the Federal Employees' Compensation Act."

Though there is doubt that the appellants, as EES employees, could be considered federal employees within the meaning of Section 202, we are nevertheless convinced that they were at least "persons acting for or on behalf of the United States" within the purview of that statute. In Standard Oil Company of California v. Johnson, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611, post exchanges were held immune from state taxation on the ground that they "are arms of the Government deemed by it essential for the performance of governmental functions"; the Court further stated that post exchanges are "integral

---

10. The High Commission Court has jurisdiction over:

"(i) All offenses against the laws and usages of war.

(ii) All offenses under any proclamation, law, ordinance, notice or order issued by or under the authority of the Military Government or of the Allied Forces.

(iii) All offenses under the laws of the occupied territory, or of any part thereof."

United States Military Government Ordinance No. 2, Military Government Courts, 12 Fed.Reg. 2190–2191.

parts of the War Department." It is significant that appellants' employment contracts, though negativing their position as federal employees, expressly stated that the EES "is an instrumentality of the United States Government and an organization of the Department of the Army." It is likewise significant that 5 U.S.C.A. § 150k expressly provided that that statute would not affect "the status of these nonappropriated fund activities as Federal instrumentalities." We have no doubt, therefore, that the EES is an instrumentality of the United States Government and that appellants, as employees of this instrumentality, were acting "for or on behalf of" the United States so as to bring them within the prohibitions of 18 U.S.C.A. § 202. See Canella v. United States, 9 Cir., 157 F.2d 470, and the annotations in 18 U.S.C.A. § 202.

(3) Counts two and three of the indictment charged that appellant Wilson on August 11, 1953, and August 12, 1953, telephoned McLane in Brussels, Belgium and asked him to deposit bribe money to the account of the Gulf States Trading Company, which had been established by the appellants Harlow and Wilson. The Government conclusively established that Wilson telephoned McLane in Brussels on July 31, 1953, and discussed the deposit of bribe money to the account of the Gulf States Trading Company. It was also proven that McLane telephoned Wilson on August 6th, 11th and 15th, 1953, and spoke to him about this deposit. We think this proof sufficiently established Wilson's guilt under counts two and three. Who made the telephone calls and on what specific dates were obviously factors of little materiality to the charges against Wilson.

Counts four through nine charged Harlow with receiving bribe money from McLane and Emborg. As to these counts, the Government's proof showed clearly that McLane and Emborg had deposited money in certain numbered bank accounts at Harlow's request. Harlow claims, however, that there was no evidence that he actually received any of this money. We think this contention to be frivolous. In our view the deposit of money into accounts designated by Harlow constituted constructive if not actual receipt of this money by Harlow. Proof of these deposits was therefore sufficient to establish Harlow's guilt under counts four through nine.

Appellants Harlow and Wilson next contend that the trial court erred in denying their motions to suppress evidence. This evidence consisted of certain incriminating letters which were written by Harlow after he had returned to San Antonio sometime in 1953 to Wilson in Germany. These letters had been seized from Wilson's quarters by EES agents under a warrant issued by Judge Turmo of the United States Court of the Allied High Commission. The warrant was issued on an affidavit prepared by one Canfield, who was at that time a prosecutor in the seventh Judicial District of the Courts of the Allied High Commission for Germany. Since Canfield's affidavit could not be located by the Government at the time of trial, the Government sought to prove its contents by the oral testimony of Canfield himself, by the testimony of Judge Turmo, who issued the warrant, and by the testimony of Warrant Officer Coleman, who was in charge of the EES investigation of "the organization." Appellants objected to this testimony on the ground that the Government had not established a proper predicate, the contention being that oral testimony could not be received to establish the contents of the affidavit until the Government first proved that a diligent search had been made for the document by its last known custodian and that it had been lost through no fault of the Government. After this objection was made, the Government secured a certificate from a Legal Officer at the Embassy of the United States at Bad Godesburg, Germany,[11] stating that he had made a dili-

11. Apparently, the records and files of the former United States Court of the Allied High Commission for Germany are now kept in various United States embassies in the Federal Republic of Germany.

gent search for the affidavit but that it could not be found.

■ Appellants contend, however, that there is no indication that defense counsel ever received the original certificate or that the trial court ever examined it to see whether it justified the receipt of the oral testimony.[12] Assuming this to be true, however, we think it is quite immaterial. Since the certificate obviously constituted an adequate predicate for the admission of the oral testimony relative to the contents of the affidavit,[13] we are unable to say that appellants were seriously prejudiced by the facts of which they now complain.

■ Appellants then argue that, even if the certificate was an adequate predicate for the admission of oral testimony, this testimony was insufficient to establish the requisite probable cause for issuance of the search warrant. We disagree. Canfield testified that the basis for his application for the warrant was information furnished him by McLane and Emborg through oral conversation and in written statements: McLane and Emborg had exposed the whole bribery scheme, and had told the EES agents of their deposits of bribe money into the numbered bank accounts at the request of Harlow and Wilson. The testimony of Warrant Officer Coleman and Judge Turmo was to the same effect. Certainly, there was probable cause to issue the search warrant on the basis of the information given by McLane and Emborg that they had paid Wilson for getting them contracts to supply the EES.

■ At the trial it came out that the EES agents investigating the bribery scheme had been intercepting and photostating Wilson's mail prior to the time that the letters from Harlow to Wilson were seized by the agents under the search warrant. McLane testified that the agents told him of these interceptions when they were interrogating him. Appellants thereafter moved for a mistrial on the ground that the above testimony demonstrated that the Harlow-Wilson letters had been improperly admitted, in that the warrant for the seizure of these letters was procured on the basis of information gathered by the investigating agents as the result of the illegal mail interceptions. In other words, appellants claimed (a) that McLane was interrogated only after the investigating agents learned of his participation in the bribery scheme by examining the letters which had been illegally intercepted; (b) that McLane thereafter confessed and persuaded Emborg to confess; and (c) that the confessions of McLane and Emborg were the basis for the issuance of the search warrant. From this appellants concluded that the evidence seized under the search warrant was the ultimate product of the illegal seizure of Wilson's mail.[14]

The trial court denied the motion for a mistrial on the ground that "the letters were obtained as a direct result of an origin wholly independent of the unlawful interception." This "wholly independent" lead to McLane was identified as a letter which had been sent to the FBI in the United States by a Dutch banker named Hoogervorst and which had come through Army channels to the investigating agents prior to the interceptions of Wilson's mail. The information supplied by Hoogervorst was to the effect that McLane was making large monthly transfers of money from banks in Holland to banks in Switzerland. After this letter was received, agent Coleman visited Hoogervorst in Amsterdam. Coleman testified that Hoogervorst could not understand how McLane "was making all

12. How or why this occurred is not entirely clear from the record.

13. See Rule 27 of the Federal Rules of Criminal Procedure and Rule 44(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

14. We think it clear that appellant Harlow, as the author of the letters which were seized, had a sufficient interest in these letters to enable him to attack the alleged illegality of their seizure. Cf. Henzel v. United States, 5 Cir., 296 F.2d 650.

these money transfers into Swiss banks" when he was employed by Dutch firms; that Hoogervorst said he could get documents to prove that McLane was shipping out some $4000 to $5000 a month to the Credit Swiss Bank in Basle, Switzerland; that he, Coleman, returned and told his superiors what he had learned and that he could get copies of these bank transfers from Hoogervorst. Coleman testified further that Hoogervorst produced the documents and that they were photostated by the investigating agents, and that this information which had been received from Hoogervorst was the initial stimulus to the investigation of McLane.

We agree with the trial court's disposition of this issue. Knowing that McLane was a representative of a number of firms selling to the EES, and suspecting the existence of a bribery scheme whereby vendors or their agents would deposit bribe money in Swiss bank accounts, the information received from Hoogervorst naturally lead the investigating agents to suspect that McLane was somehow involved in the scheme. The investigating agents were not forever precluded from interrogating McLane and pressing him to confess merely because they thereafter illegally seized other evidence tending to implicate McLane in the bribery scheme. McLane did not indicate that he would not have confessed if he had not been told of the interceptions of Wilson's mail by the investigating agents.[15] For all we know, McLane would have told all regardless of whether this information was imparted to him by the investigating agents. Knowing that he was suspected of paying bribes to Harlow and Wilson, and confronted with the documentary evidence of his money transfers to Swiss banks,

McLane may well have been persuaded that the "jig was up" and that it would be best for him to make a full disclosure of his dealings with Harlow and Wilson. We are unable to say, therefore, that the information received from McLane, which led to the search of Wilson's quarters, was the ultimate product of the illegal interceptions of Wilson's mail. The burden was on the appellants to establish that a substantial part of the case against them was "a fruit of the poisonous tree." Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307. In our opinion, appellants failed to carry this burden. The trial court thus did not err in denying the motion for a mistrial. See United States v. Bell, D.C. D.C., 126 F.Supp. 612.

We come now to appellant Wilson's plea that his trial and conviction on the conspiracy charge violated the constitutional prohibition against double jeopardy. This plea is based on the fact that, in March, 1954, Wilson was convicted before the United States Court of the Allied High Commission for Germany for conspiring with Harlow and others to receive bribes from persons selling merchandise to the EES, in violation of the Laws of the Allied High Commission.[16] Wilson was sentenced to six months in prison but was released before the entire sentence was served after he promised to cooperate with the authorities in their further investigation of "the organization." The plea of double jeopardy based on the above conviction was rejected by the court below.

There are always two questions which must be resolved when a defendant in a criminal case interposes a plea of former jeopardy. The first is whether both tribunals before which

---

15. It might be noted that agent Coleman, who interrogated McLane, denied ever informing him of these interceptions. However, the trial court apparently found to the contrary on the basis of McLane's testimony, and we cannot say that his finding was clearly erroneous.

16. Wilson was also tried for "receiving" bribes, in violation of the Laws of the Al-

lied High Commission and Paragraph 266 of the German Criminal Code relating to breach of trust. He was acquitted on these charges. Wilson apparently concedes that his acquittal on the charges of *receiving* bribes was not a bar to his prosecution for *conspiring* to receive bribes and for *soliciting* bribes. See United States v. Bayer, 331 U.S. 532, 542, 67 S.Ct. 1394, 91 L.Ed. 1654.

the defendant was tried derived their authority and jurisdiction from the same sovereign;[17] the second is whether both prosecutions were for the same "offense." Thus, in the instant case, we must determine (1) whether the United States Court of the Allied High Commission for Germany derived its authority and jurisdiction from the United States and (2) whether the offense of conspiracy for which Wilson was convicted below was the same offense for which he was convicted in the High Commission Court.

As to the first question, there can be no doubt that the former United States Court of the Allied High Commission for Germany derived its authority and jurisdiction from the United States. Madsen v. Kinsella, 343 U.S. 341, 72 S.Ct. 699, 96 L.Ed. 988, made this absolutely clear. In that case the Supreme Court fully discussed the history and nature of the High Commission Court.

Nor can there be any doubt that an acquittal or conviction before a military or quasi-military tribunal deriving its authority and jurisdiction from the United States can be set up as a bar to another prosecution for the same offense before a civil court of the United States. This has been the law at least since the Supreme Court decided Grafton v. United States, 206 U.S. 333, 27 S.Ct. 749, 51 L.Ed. 1084. In that case it was held that a soldier acquitted of the crime of homicide by a military court-martial of competent jurisdiction proceeding under the authority of the United States could not subsequently be tried for the same offense in a civil court deriving its authority from the United States. The Court spoke in these words:

" * * * The express prohibition of double jeopardy for the same offense means that wherever such prohibition is applicable, either by operation of the Constitution or by action of Congress, no person shall be twice put in jeopardy of life or limb for the same offense. Consequently, a civil court proceeding under the authority of the United States cannot withhold from an officer or soldier of the Army the full benefit of that guaranty, after he has been once tried in a military court of competent jurisdiction. Congress, by express constitutional provision, has the power to prescribe rules for the government and regulation of the Army, but those rules must be interpreted in connection with the prohibition against a man's being put twice in jeopardy for the same offense. The former provision must not be so interpreted as to nullify the latter. If, therefore, a person be tried for an offense in a tribunal deriving its jurisdiction and authority from the United States and is acquitted or convicted, he cannot again be tried for the same offense in another tribunal deriving its jurisdiction and authority from the United States. A different interpretation finds no sanction in the Articles of War; for the 102d Article of War (which is the same as Article 87, adopted in 1806, 2 Stat. 369) declares that 'no person' —referring, we take it, to persons in the Army—'shall be tried a second time for the same offense.' But we rest our decision of this question upon the broad ground that the same acts constituting a crime against the United States cannot, after the acquittal or conviction of the accused in a court of competent jurisdiction, be made the basis of a second trial of the accused for that crime in the same or in another court, civil or military, of the same government. * * * "

17. United States v. Grafton, 206 U.S. 333, 352, 27 S.Ct. 749, 51 L.Ed. 1084. Neither the Fifth nor the Fourteenth Amendments prohibit multiple prosecutions by different sovereigns, even though the prosecutions are based on the same facts and require the same evidence to sustain them. See Bartkus v. United States, 359 U.S. 121, 79 S.Ct. 676, 3 L. Ed.2d 684 and Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729.

We come then to the question of whether Wilson's conviction on count one of the instant indictment relates to the same offense for which he was convicted in the High Commission Court. As to this question, it is now settled that "the test of identity of offenses is whether the same evidence is required to sustain them." Morgan v. Devine, 237 U.S. 632, 641, 35 S.Ct. 712, 59 L.Ed. 1153. That the offenses are not "the same in name" is immaterial. Grafton v. United States, supra, 206 U.S. at 351, 27 S.Ct. 749. Thus, the ultimate issue here is whether the proof required to sustain Wilson's conviction on count one of the instant indictment was the same proof as was required to sustain his conviction for violating the Laws of the Allied High Commission. We think that it was.

The essence of both conspiracy charges was that Wilson had agreed that Harlow and others to receive bribes from persons selling merchandise to the EES. Both charges involved the same agreement, the same vendors, the same merchandise, the same numbered bank accounts, etc. In short, both charges related to one continuing conspiracy and to Wilson's participation in it. The evidence adduced at both trials demonstrating Wilson's participation in the conspiracy was substantially identical. Nothing of significance that was proven at the second trial had not already been proven at the first. This evidence was sufficient to sustain Wilson's conviction for violating the Laws of the Allied High Commission and for violating 18 U.S.C. A. § 371. The offenses, though not "the same in name," were the same in fact. Since Wilson has already been convicted for conspiring with Harlow to take bribes from McLane and Emborg, his conviction on count one of the indictment for the same offense cannot be allowed to stand. It clearly violates Wilson's constitutional right to be free of successive prosecutions for the same offense.

Finally, the appellants have raised numerous issues with respect to the trial court's charge and with respect to the admission and exclusion of various items of evidence. We have carefully examined the trial court's instructions to the jury and find them adequate. Although a few items of evidence were possibly erroneously admitted over objections that they were hearsay, the guilt of appellants Harlow and Wilson was established by overwhelming competent evidence. We are satisfied, therefore, that the rulings of which appellants complain did not prejudice them.

For the reasons above stated, (1) the conviction of appellant Harlow on all counts is affirmed; (2) the conviction of appellant Wilson on counts two and three is affirmed; (3) the conviction of appellant Wilson on count one is reversed; and (4) the conviction of appellant Addy on count one is reversed.

RIVES, Circuit Judge (concurring specially).

I concur in the result, but differ from one part of the opinion which seems to me not necessary for the result. The statement in the opinion that the right to a speedy trial guaranteed by the Sixth Amendment does not arise until after a prosecution is instituted against the accused is supported by several opinions of Courts of Appeals. See Foley v. United States, 8 Cir., 1961, 290 F.2d 562, 565, and cases there cited. It does not seem to me, however, that that proposition is "well established" in the absence of a controlling decision of the Supreme Court; and, with deference, I am not convinced that it is sound. I forego expressing reasons for my doubts because I am satisfied that, under the facts of this case, there was no unnecessary and unreasonable delay at any stage, either before the prosecution was instituted or afterward. In all other respects, I am in full accord with the comprehensive and able opinion. I therefore concur specially.