**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Martin W. HOULTIN, Robert Burke, Duane Morrison, Michael Francis, Kenneth B. Phillips and Kenneth J. Croucher, Defendants-Appellants.**

**No. 74–4144.**

United States Court of Appeals, Fifth Circuit.

Jan. 12, 1976.

944

Lee A. Chagra, El Paso, Tex., for Houltin, Burke, Morrison and Francis.

Malcolm McGregor, El Paso, Tex., for Croucher.

William M. Ravkind, Dallas, Tex. (Court appointed), for Phillips.

William S. Sessions, U. S. Atty., Jeremiah Handy, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before JONES, WISDOM and AINSWORTH, Circuit Judges.

WISDOM, Circuit Judge:

This case presents two serious questions. (1) Were the arrests of alleged importers of marijuana procured through the exploitation of illegal wiretaps? (2) Were the convictions for both conspiracy to import and conspiracy to possess the drug, despite the existence of only one conspiratorial agreement, in violation of the defendants' protections against double jeopardy?

For several years before their arrests, the defendants-appellants, Martin W. Houltin, Robert Burke, Duane Morrison, Michael Francis, Kenneth B. Phillips, and Kenneth J. Croucher, had been under extensive investigation for narcotics smuggling activities. Agents of the State of New Mexico applied to a state court for authorization to intercept telephone communications from Houltin, Morrison, and Burke. The court granted the request and, later, a request for an extension of the authorization. Two of the intercepted telephone calls allegedly indicated that the conspirators had arranged to meet at the Columbus, New Mexico airport at a given time. The dogged surveillance of the agents led them to Mexico, where Houltin, Morrison, and Burke picked up 2260 pounds of marijuana and returned to New Mexico. There, all the defendants were arrested and the marijuana seized.

After their arrests, the defendants entered pleas of nolo contendere to various state charges, and each was assessed an 18-month probated sentence and fined $1,000 by a New Mexico state court. Five months later they were indicted by a federal grand jury for alleged violations growing out of the same acts that were the subject of the state charges. The district judge found that the state wiretaps were illegal and granted the defendants' motion to suppress the evidence obtained from those wiretaps.[1] In his pretrial order, the trial judge stated that in his opinion the wiretaps did not contribute to the apprehension of the defendants or to the seizure of the marijuana they were transporting, but he left this question to be decided by the jury. He denied, however, the motion to suppress the marijuana. The jury, after being instructed to find beyond a reasonable doubt that the arrests would have occurred even without the wiretaps, found each defendant guilty of two conspiracy counts. The trial judge sentenced each to consecutive five-year terms of imprisonment on each count and imposed varying fines on the defendants.

I.

All the defendants contend that their arrests and the seizure of the marijuana were fruits of the illegal wiretaps which fatally infected their convictions. The two wiretaps that the district court found illegal—a finding that the government does not now challenge—were of a telephone conversation between Houltin and his wife and another between Mrs. Houltin and Phillips's wife. First, we must determine who has standing to challenge the legality of the wiretaps. Second, we must determine whether the arrests and the imported marijuana were obtained through exploitation of the illegal wiretaps.

---

1. The wiretaps were held illegal apparently because of noncompliance with 18 U.S.C. § 2516(2), which requires the "principal prosecuting attorney of any state, or the principal prosecuting attorney of any political subdivision thereof" to apply to a state court judge for an order authorizing a wiretap. The wiretap applications in this case were signed only by an assistant district attorney.

## A. Standing

█ The government argues that only Houltin has standing to make the challenge. This argument overlooks the second telephone conversation, the one between Mrs. Houltin and Mrs. Phillips. This call was also an integral part of the investigation leading to the arrests. In *Alderman v. United States*, 1969, 394 U.S. 165, 176, 89 S.Ct. 961, 968, 22 L.Ed.2d 176, 188, the Supreme Court held that "any petitioner would be entitled to the suppression of government evidence originating in electronic surveillance . . . if the United States unlawfully overheard conversations of a petitioner himself or conversations occurring on his premises, *whether or not he was present or participated in those conversations*". (Emphasis supplied). Since Mrs. Phillips, a participant in the second wiretapped conversation, was speaking from defendant Phillips's home, *Alderman* grants him standing to challenge the legality of that wiretap and the admission of evidence to which it led the government.

This leaves open the question whether the other four defendants, who were not participants in the intercepted conversations and who did not own the property on which the intercepted calls were placed, have standing to challenge the legality of the wiretaps.

In a recent case this Court studied the Fourth Amendment law of standing, from the enactment of the amendment to present times. We stated the relevant test as follows:

.[D]efendants must demonstrate a 'legitimate interest' of some kind in the premises searched or the objects seized. . . . [T]he decisive factor in determining whether a search or seizure is 'reasonable' for Fourth Amendment purposes is whether the complaining party's reasonable expectations of privacy have been unreasonably disturbed.

*United States v. Hunt*, 5 Cir. 1974, 505 F.2d 931, 939–40, cert. denied, 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466.

█ Burke, Morrison, Francis, and Croucher had no reasonable expectation of privacy in the wiretapped conversation their coconspirator Houltin had with his wife and that which Mrs. Houltin had with Mrs. Phillips. Indeed, in the recent case of *United States v. Scasino*, 5 Cir. 1975, 513 F.2d 47, 50, we indicated that such a privacy interest may only be asserted by "one who participated in the intercepted conversation or on whose premises the conversation occurred".[2] And in *Alderman*, 394 U.S. at 171–72, 89 S.Ct. at 965, 22 L.Ed.2d at 185–86, the Supreme Court stated in unambiguous terms:

The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Coconspirators and codefendants have been accorded no special standing.[3]

---

2. We also obtain guidance from *United States v. Garcilaso de la Vega*, 2 Cir. 1974, 489 F.2d 761. In that case the government used an illegal wiretap in an investigation of the marijuana trafficking of Juan Santos. The intercepted conversation that was the subject of a motion to suppress was between Santos and a third party and led to the apprehension of the appellant, who was Santos's supplier. The court denied standing to the appellant because his phone was not tapped and he was not a party to the intercepted conversation. As in the present case, it was foreseeable to the police that the information obtained from the wiretap would lead to the apprehension of the appellant, who was a coconspirator of the party whose phone was tapped.

3. According to Fed.R. Crim.P. 41(e) and 18 U.S.C. § 2518(10)(a), an "aggrieved person" may move to suppress evidence derived from an illegal wiretap. The statutory phrase does not liberalize the common law of standing. *See United States v. Calandra*, 1974, 414 U.S. 338, 348, n. 6, 94 S.Ct. 613, 38 L.Ed.2d 561. That phrase is defined in 18 U.S.C. § 2510(11) as "a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed". Moreover, in *Alderman*, 394 U.S. at 175, n. 9, 89 S.Ct. at 968, the Court held that " 'aggrieved person' . . . should be construed in accordance with existent standing rules".

We hold, therefore, that only Houltin and Phillips have standing to challenge the legality of the two wiretaps at issue.

B. Exclusion of the Tainted Evidence

■ The "prime purpose" of the Fourth Amendment exclusionary rule "is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable search and seizures". *United States v. Calandra*, 1974, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561, 571. The essence of that rule is not merely "that . . . evidence so acquired shall not be used before the Court but that it shall not be used at all".[4] *Silverthorne Lumber Company v. United States*, 1920, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319, 321. The determination whether information gained by the police in an illegal search was used to obtain other evidence against the accused is not based upon whether the subsequent evidence would not have come to light but for the illegal actions of the police, but rather upon "whether, granting establishment of the primary illegality, the evidence to which [the] objection is made has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint". *Wong Sun v. United States*, 1963, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455, *quoting* Maguire, Evidence of Guilt 221 (1959).

■ Evidence should be excluded only where the benefit accruing to society from the additional deterrent against unlawful police practices equals or exceeds the detriment to society caused by the release of criminals. Hence, two exceptions to the exclusionary rule of *Silverthorne* have developed. *See* Comment, Fruit of the Poisonous Tree—A

Plea for Relevant Criteria, 115 U.Pa.L. Rev. 1136, 1138 (1967). We set out these two exceptions in *United States v. Castellana*, 1974, 488 F.2d 65, 67, *rev'd on other grounds*, 500 F.2d 325 (en banc): "First, the connection between the lawless conduct of the police and the discovery of the challenged evidence may 'become so attenuated as to dissipate the taint.' *Nardone v. United States*, 1939, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312. . . . The second means for 'purging the taint' is discovering the same evidence from an 'independent source.' [*Silverthorne*, 251 U.S. at 392, 40 S.Ct. 182]".

■ It was established in *Nardone*, 308 U.S. at 341, 60 S.Ct. at 267, 84 L.Ed. at 311, that the accused has the burden of proving both that the wiretap was unlawfully employed and that a substantial portion of the evidence against him was fruit of that poisonous tree. The prosecution is then given an opportunity to prove that the subsequently obtained evidence falls within one of the recognized exceptions to the exclusionary rule of *Silverthorne*.

■ In order to determine which party, if either, has carried its burden, it will be necessary to construct a detailed account of the events leading to the arrests. In December 1971, Operation Sky Night began. This was a joint federal-state investigation sponsored by the Drug Enforcement Administration (D.E.A.) and aimed at the suspected conspiracy of the defendants (among others) to import marijuana into New Mexico by aircraft. By September 1973, the government admitted that its investigative procedures had failed and applied to the state court in New Mexico for authorization to tap the telephones of Houltin, Morrison, and Burke. The application was granted, and the telephones were

---

4. This rule is codified in 18 U.S.C. § 2518(10)(a), which authorizes the suppression of "the contents of any [unlawfully] intercepted wire or oral communication, *or evidence derived therefrom* . . . ." (emphasis supplied). This "fruit of the poisonous tree" doctrine "is a response to the realization that if police officers are permitted to use

knowledge gained from unlawfully obtained evidence to obtain the same or other valuable evidence legally, an inducement to commit such unlawful practices continues *to* exist". Comment, Fruit of the Poisonous Tree—A Plea for Relevant Criteria, 115 U.Pa.L.Rev. 1136, 1138 (1967).

tapped between September 27 and October 12, 1973.

On the latter date the nearly two-year drought of Operation Sky Night finally came to an end. Gerald Weatherman, an agent-pilot for the D.E.A., had been responsible for the surveillance of the defendants for over a year and a half. On October 12, he observed Houltin, Burke, and Francis leave an El Paso coffee shop at about 1:00 p. m. and proceed toward the Sunland Park Airport, which was just across the New Mexico border. Weatherman then went to the El Paso International Airport, boarded his aircraft, and flew over the Sunland Park Airport, where he observed the defendants' departure in their planes.

Weatherman was unaware that Houltin had placed a telephone call to his wife from the Sunland Park Airport. He asked her to "call the man . . . [a]nd tell him we're running a little bit late and it'll be about two o'clock". He also told her to cancel their social plans for the evening. His wife then called Mrs. Phillips and told her, in part, "[w]ill you tell your old better half that they're running a little bit late and he'll be in at two o'clock". The reference to two o'clock was apparently the time at which Houltin expected to arrive in Columbus, New Mexico. Tommy Holder, the state police officer who was manning the wiretaps in Columbus, intercepted both of the conversations, which occurred between 1:17 p. m. and 1:23 p. m. Holder then informed "Sector" (the El Paso headquarters of Operation Sky Night) of the substance of the intercepted conversations. The key question in this case is whether the conspirators were subsequently arrested through government exploitation of information obtained from these wiretapped conversations.

The plot continues. Agent Weatherman observed Houltin, Burke, and Francis depart from the Sunland Park Airport at about 1:30 p. m. and followed them in his aircraft to Columbus, where

the defendants landed at about 2:00 p. m. Weatherman then returned to the El Paso Airport for refueling, arriving at about 2:30. He testified that he had intended to "relax for a little while" at the airport before returning to Columbus to continue the surveillance. The relaxation was cut short by a phone call Weatherman received from Sector indicating that "all the people were at the airport at Columbus, so I'd better get back over there, and start surveillance again". Weatherman then left El Paso at about 2:50 and arrived over the Columbus Airport at 3:30, just in time to observe the defendants' departure. He testified that he left the El Paso Airport immediately after receiving the phone call from Sector, and that had he not received that call he would not have arrived in Columbus in time to observe the departure of the defendants. Weatherman then followed the defendants to the location in Mexico where they picked up the marijuana, and then back to New Mexico, where he directed ground forces in the apprehension of the defendants and the seizure of the marijuana.

The above summary of the evidence indicates that the defendants have carried their burden of proving that their apprehension and the marijuana seizure resulted from the exploitation of information gleaned from the illegal wiretaps. The government, in rebuttal, contends that the crucial phone call from Sector to Weatherman was based upon a source independent of the information obtained from the two intercepted telephone conversations. This contention is based on the alleged actions of agent Holder after he intercepted those two conversations and relayed the information to Sector. He then left the wiretap center and went to the Columbus Airport, where he saw the appellants' planes take off at about 3:30.[5] He immediately called Sector to report his observation.

The government argues that the key call from Sector to Weatherman was

---

5. Both the testimony of Sgt. Holder and the report of agent Weatherman filed shortly after these incidents are in agreement that the defendants' planes departed from the Columbus Airport at about 3:30 p. m.

based on information obtained from the *second* call from Holder to Sector. The times that the various calls were placed reveals the fatal flaw in the government's argument. The key call to Weatherman was placed between 2:30 and 2:50; Holder testified that his second call to Sector was placed after he observed the appellants' planes leave the Columbus airport, which was at about 3:30. It was therefore not possible that the second call from Holder could have been the basis for the call from Sector that Weatherman received at the El Paso Airport. Moreover, Holder's second phone call was placed *after* he observed the defendants' planes depart from the Columbus Airport, but the key call from Sector to Weatherman had to have been placed sufficiently before the defendants' departure to give Weatherman enough time to fly the approximately thirty-minute flight from El Paso to Columbus in time to observe the defendants leave. We therefore conclude that there was no source for the key phone call to Weatherman that was independent of the information gleaned from the illegally intercepted calls.

The government next contends that the arrest of the defendants and the seizure of the marijuana were not achieved through "exploitation" of the illegally monitored conversations because, even without the alert from Sector, agent Weatherman would have returned to Columbus and, after discovering that the defendants had already departed, would have proceeded to Mexico. This argument is based on the "inevitable discovery" doctrine, which this circuit has unambiguously rejected. *Parker v. Estelle,* 5 Cir. 1974, 498 F.2d 625, 629–30 n. 12, cert. denied, 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450; *United States v. Castellana,* 488 F.2d at 68.

Finally, the government argues that the intricate work of its agents in tracking the defendants to Mexico and then back to New Mexico and in coordinating the arrests rendered the connection between the illegal wiretaps and the arrests sufficiently attenuated so as to dissipate the taint of those wiretaps. Two recent decisions by this Court illustrate the circumstances in which the "attenuation" exception is applicable. In *United States v. Owen,* 5 Cir. 1974, 492 F.2d 1100, cert. denied, 419 U.S. 965, 95 S.Ct. 227, 45 L.Ed.2d 709, the government illegally searched Owen's car, found a revolver, and then arrested Owen for his possession of the weapon. While at the police station, Owen was told by a postal inspector that he was suspected of mail fraud and was invited to return to discuss the matter. He returned in four days and on several later occasions and eventually confessed and agreed to cooperate with the government's investigation of the mail fraud conspiracy in return for a government recommendation of leniency as to Owen's punishment. Owen later challenged that agreement and certain evidence obtained pursuant to the agreement on the ground that they were tainted by the illegality of the original search of his car. We held that the taint had been dissipated by the time Owen agreed to cooperate in the mail fraud investigation.

In *Parker v. Estelle,* Parker's confession to the killing of his father was suppressed by the trial judge. Before Parker's confession, the Parker family gardener, Morales, had indicated to the police that he saw or heard nothing suspicious at the time of the death. Some time after being informed of Parker's confession, Morales changed his statement, indicating that he heard two gun shots and then saw Parker flee from the scene. The government relied exclusively on this testimony at trial, and Parker was convicted. On appeal, Parker challenged the admission of Morale's testimony, contending that it was the fruit of the invalid confession. We held that whatever connection there may have been between Parker's confession and Morale's testimony was so attenuated as to dissipate the taint.

In both cases the challenged evidence had so many possible sources apart from the original illegality that it was doubtful that the illegality was even a "but

for" cause of the procurement of the challenged evidence. For example, in *Owen* we expressly relied upon the voluntariness of Owen's subsequent visits to the postal inspector's office, the quid pro quo given for Owen's cooperation, and the four-day time lapse between the arrest and the initial discussion between Owen and the inspector. 492 F.2d at 1107. In *Parker* we noted that "[t]he exact reason why Morales decided to tell the truth cannot be discerned from the record before us" and that "the facts will not permit us to tie the acquisition of the evidence clearly and directly to the confession . . . ." 498 F.2d at 630. In the present case, however, the arrests occurred on the same day that the illegally obtained evidence was procured and, as the above summary of the record clearly establishes, those wiretaps were a "but for" cause of the later arrests. Moreover, the nearly two-year fruitless investigation of the marijuana smuggling activities of the defendants indicates that their arrests on October 12 were secured through exploitation of the evidence obtained from the wiretaps, which had been instituted only about two weeks earlier.

Because the primary purpose of the exclusionary rule is deterrence, "[t]he critical question when dealing with attenuation should be whether the admissibility of the challenged evidence will create an incentive for illicit police activity in the future". Pitler, "The Fruit of the Poisonous Tree" Revisited and Shepardized, 56 Calif.L.Rev. 579, 646 (1968). In *Parker*, after noting that it was beyond the scope of the unlawful purpose of the police in obtaining Parker's confession to secure information from Morales, we observed that the exclusion of the confession would be "an ample deterrent". 498 F.2d at 630. In the present case, however, the police would not be adequately deterred by exclusion of the conversations intercepted by the wiretap. They would still have an incentive to make illegal wiretaps to obtain information that would *lead to* the arrest of the suspects. We therefore hold that, in order

to effectuate the deterrent purpose of the Fourth Amendment exclusionary rule, it is necessary to reverse the convictions of Houltin and Phillips because they were based on evidence derived through exploitation of illegal wiretaps. *See* Pitler, 56 Calif.L.Rev. at 641–46; Comment, 115 U.Pa.L.Rev. at 1148–49.

II.

The appellants argue that their protections against double jeopardy were violated by the imposition of consecutive sentences for the offenses of conspiring to possess (21 U.S.C. § 846) and conspiring to import marijuana (21 U.S.C. § 963). In addition, they contend that the indictment was duplicitous and led to a multiplicity of punishments for a single offense. They assert that there was only one conspiratorial agreement, and that, therefore, no matter how many illegal objects existed, there was only one conspiracy. Three circuits have decided this issue. Two have held that multiple prosecutions are not sustainable under the above two conspiracy provisions. *United States v. Honneus,* 1 Cir. 1974, 508 F.2d 566 (not sustainable), cert. denied, 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101; *United States v. Adcock,* 6 Cir. 1973, 487 F.2d 637 (not sustainable); *United States v. Marotta,* 9 Cir. 1975, 518 F.2d 681 (sustainable). Today we even the score at two–two.

Assuming that there was only one conspiracy in the present case, Congress may choose to punish two aspects of that behavior without contradicting the Double Jeopardy Clause. In *Gore v. United States,* 1958, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405, the petitioner was prosecuted for the violation of three statutes by one sale of heroin. In rejecting his contention that this multiple prosecution violated his double jeopardy protections, the Supreme Court stated:

It seems more daring than convincing to suggest that three different enactments, each relating to a separate way of closing in on illicit distribution of narcotics, passed at three different

periods, for each of which a separate punishment was declared by Congress, somehow or other ought to have carried with them an implied indication by Congress that if all these three different restrictions were disregarded but, forsooth in the course of one transaction, the defendant should be treated as though he committed only one of these offenses. . . . Both in the unfolding of the substantive provisions of law and in the scale of punishments, Congress has manifested an attitude not of lenity but of severity toward violation of the narcotics laws.

357 U.S. at 390–91, 78 S.Ct. at 1283–84. Similarly, in the present case, there are two different criminal statutes, each relating to different aspects of a conspiracy to import and distribute narcotics, and each prescribing separate punishments. For these reasons we respectfully disagree with the two Courts of Appeals that have held that separate convictions cannot be obtained under §§ 846 and 963 when there is only one conspiratorial agreement.

We strongly endorse, however, the reasoning of the Ninth Circuit in *United States v. Marotta,* 518 F.2d at 685, in which the Court upheld convictions under the two above statutes:

The validity of appellant's convictions does not turn on whether there was one conspiracy or two. Congress has defined the evils to be prohibited as conspiracies with specified criminal objects. Granting that appellant was engaged in a single conspiracy with dual criminal objects, this court finds that Congress fully intended to permit punishing such conspiracies twice as severely as those which embraced only one of the specified criminal objects. . . . Congress has in effect determined that a conspiracy to import drugs with intent to distribute is twice as serious as a conspiracy to import for

personal use or a conspiracy to possess with intent to distribute. Such a determination does not offend the double jeopardy clause . . . .

Our decision today is fully consistent with two cases on which the appellants rely, *Braverman v. United States,* 1942, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23; and *United States v. Mori,* 5 Cir. 1971, 444 F.2d 240, cert. denied, 404 U.S. 913, 92 S.Ct. 238, 30 L.Ed.2d 187. In *Braverman* the Court held that when there is a single agreement to violate several substantive statutes, the conspirators may not be prosecuted for more than one violation of the statute prohibiting conspiracies against the United States, presently 18 U.S.C. § 371. This holding reflected the Court's view that the congressional intent underlying that section was to adopt the common law definition of conspiracy, thereby proscribing the *agreement* to commit unlawful acts against the United States rather than the unlawful objects themselves.[6] In *Mori* we held that a single conspiracy to import heroin may not be held violative of both the general conspiracy statute, 18 U.S.C. § 371, and the statute that specifically proscribes conspiracies to import narcotics.[7] We held, as a matter of statutory construction, that "the catchall provisions of [the former] section become subsumed under the particular, specific provisions of [the latter] section". 444 F.2d at 245.

Unlike these cases, the present case involves *two specific* conspiracy statutes. We agree with the Ninth Circuit that Congress intended to punish conspiracies violating both statutes more severely than those violating only one of the statutes.

We have considered the defendants' other arguments and find each to be without merit. Before concluding, we note the seemingly anomalous result this opinion has achieved: the convictions of Houltin and Phillips, probably the lead-

6. The Court stated that "[t]he single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute, [18 U.S.C. § 371]". 317 U.S. at 54, 63 S.Ct. at 102.

7. The statute, 21 U.S.C. § 174, has since been repealed, but its relevant portion is similar to 21 U.S.C. § 963, which is at issue in the present case.

ers of the conspiracy, are reversed, while the other four conspirators—the underlings—remain in prison. This can be explained only by the compromise embodied in our law governing standing to invoke the exclusionary rule. *See* Comment, 115 U.Pa.L.Rev. at 1141. *But see Broeder, Wong Sun v. United States:* A Study in Faith and Hope, 42 Neb.L.Rev. 483, 539–45 (1963); Comment, Judicial Control of Illegal Search and Seizure, 58 Yale L.J. 144, 154–58 (1948). That law balances the need to deter unlawful police conduct against the equally important need to imprison criminals. The result of this balancing is that the exclusionary rule may be asserted by only a portion of those against whom unlawfully seized evidence is sought to be used. The defendants with standing are those whose rights have been most egregiously violated: those whose legitimate expectations of privacy have been invaded by the State. *See United States v. Calandra,* 1974, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561. Hence, we reverse the convictions of Houltin and Phillips and affirm those of Burke, Morrison, Francis, and Croucher.

Affirmed in part, reversed in part.