UNITED STATES of America,
Plaintiff-Appellee,

v.

Wayne Garfield BROOKINS, III,
Defendant-Appellant.

No. 79–5225.

United States Court of Appeals,
Fifth Circuit.

April 3, 1980.

Richardson R. Lynn, Nashville, Tenn., for defendant-appellant.

J. R. Brooks, U.S. Atty., Frank M. Salter, Asst. U.S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before AINSWORTH, VANCE and ANDERSON, Circuit Judges.

VANCE, Circuit Judge:

Wayne Garfield Brookins, III, was convicted of receiving or concealing a stolen vehicle, 18 U.S.C. § 2313. He appeals the district court's refusal to suppress certain evidence. We affirm.

I.

The Mountain Brook Police received a complaint from a female friend of Brookins, on September 4, 1978, asking that Brookins and his belongings be removed from her apartment where he had been living. The police arrested Brookins for public intoxication. The female companion voluntarily turned over many of Brookins' belongings to the police. These included about eighteen automobile keys, several license plates issued by the District of Columbia, several tag receipts issued there and in Alabama, several bills of sale for Jaguar automobiles, several traffic citations, and two manuals published by the National Automobile Theft Bureau and disseminated only to law enforcement officials. The police determined that the vehicle identification number (VIN) and license tag of the blue Jaguar that Brookins then possessed were registered to another person and had been obtained with two different addresses. The police subsequently released Brookins and returned his possessions. The legality of these actions is not challenged.

Officer Thompson of the Mountain Brook Police observed a white Jaguar with a District of Columbia license tag in a local motel parking lot at about 1:00 a. m. on November 27, 1978. He viewed the license tag number and public VIN number from outside the vehicle and immediately checked these through the National Crime Information Center and local authorities. He learned that District of Columbia authorities did not have any record of the license tag and that the VIN was registered to Ronald Fry at a false Birmingham address. Officer Thompson then determined that Brookins was registered at the motel under a Nashville address, and found from Nashville authorities that the address was false. He reported this information to Lt. Littlefield, who on November 27 assigned Officer Watkins on the incoming day shift to observe the Jaguar until the police could obtain a search warrant. Officer Watkins failed to find the vehicle when he arrived at the motel. He periodically checked for it through the day.

Lt. Littlefield meanwhile examined the motel record of long distance telephone calls and noted the numbers that Brookins had called. Lt. Littlefield sent three Nashville telephone numbers that he had found

in the motel long distance records to that city's vice squad. On November 27 it reported the name of the individual listed to one number as M.D. Holt. The police also investigated a traffic citation that they found among Brookins' belongings on September 4. It was issued in Irondale, Alabama, to David L. Hurst, who resided in Nashville. The police gave the names of M.D. Holt and Hurst to an FBI agent in Nashville, who interviewed them.

Officer Watkins saw Brookins' Jaguar driving toward Birmingham on the next day, November 28. He arrested Brookins for having an improper license plate, and then charged him with violating the state uniform title law because a VIN plate had been removed. The police towed the Jaguar to city hall for an inventory. They discovered that the public VIN differed from the true VIN and that the doorframe VIN had been defaced. In the Jaguar's trunk they found a set of VIN plates for a Jaguar, another license tag, a title certificate, and a tag receipt. The police had not obtained an arrest warrant or search warrant.

The Mountain Brook Police incarcerated Brookins for seventy-two hours, without presenting him to a magistrate, and interrogated him for a total of six or seven hours of that time. They promised Brookins that they were "not interested in you" but wanted information about other automobile thieves and that his statements were " 'off the record.' " He gave a handwritten consent to a search of his motel room, and made some incriminating statements in reliance on those promises. The police asked him whether he had placed a telephone call to anyone named Holt, and Brookins gave them the name of Carlton Holt. Carlton Holt later became the primary witness for the prosecution. The police released Brookins to federal authorities on December 1.

At the time of the custodial interrogation of Brookins on November 28–29, the police had the name and address of M.D. Holt but had not then learned of Carlton Holt. The government argues with some ambiguity that the Nashville agent later reported the

name of Carlton Holt back to the Mountain Brook Police, while Brookins contends that Hurst did not give Carlton Holt's name (although M.D. Holt might have disclosed it) and that the police first obtained the name directly through Brookins' interrogation statements.

Brookins was tried before a jury in federal district court for receiving or concealing a stolen 1974 Jaguar. 18 U.S.C. § 2313. He moved before trial to suppress the incriminating statements and the search consent given during the custodial interrogation, and the court granted the motion. Brookins also moved to suppress the Jaguar and its contents, but the court denied the motion and admitted it into evidence. He moved at trial to exclude Carlton Holt's testimony as the fruit of his interrogation statement disclosing Holt's identity, and the court denied that motion also. The judge reasoned that the police "picked up the lead on M.D. Holt before [they] started questioning," and that Carlton Holt's name "clearly was discoverable from information they obtained independent of that [interrogation statement]," although the statement was in fact a source of Holt's name. Holt then testified that he assisted Brookins in stealing the 1974 Jaguar in Nashville. The jury found Brookins guilty.

## II. WARRANTLESS SEARCH AFTER PROBABLE CAUSE EXISTED.

Brookins contends, first, that the police had probable cause to obtain a warrant and search the Jaguar on the morning of November 27, and that their failure to get a warrant renders the subsequent search illegal as a warrantless search incident to a pretext arrest. We hold that his arrest was valid and the search legal.

In upholding a warrantless examination of the exterior of an automobile parked in a public place based on probable cause and exigent circumstances, the Supreme Court stated that the prior availability of a warrant did not invalidate the warrantless search. *Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (plurality opinion).

[W]e know of no case or principle that suggests that the right to search on probable cause and the reasonableness of seizing a car under exigent circumstances are foreclosed if a warrant was not obtained at the first practicable moment. . . . The exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action. *Id.* at 595–96, 94 S.Ct. at 2472. *Accord, United States v. Mitchell*, 538 F.2d 1230, 1232 (5th Cir. 1976) (en banc), *cert. denied*, 430 U.S. 945, 97 S.Ct. 1578, 51 L.Ed.2d 792 (1977). A warrantless search based on probable cause and exigent circumstances therefore is not rendered suspect or invalid as a deliberate bypass of a warrant by the prior existence of probable cause for a search warrant. *E. g., United States v. Mitchell*, 538 F.2d at 1232–33; *see Cardwell v. Lewis*, 417 U.S. at 595, 94 S.Ct. at 2471. An inventory search of an automobile incident to a warrantless arrest that was made reasonable by probable cause is not invalidated as a pretext arrest by the previous occurrence of probable cause, even if the search uncovers evidence that leads to an indictment for a different crime.

■ The police delay in arresting Brookins and in searching his Jaguar was valid and was not "foreclosed if a warrant was not obtained at the first practicable moment" because probable cause and exigent circumstances existed at the time of the arrest and the automobile's seizure. *Cardwell v. Lewis*, 417 U.S. at 595, 94 S.Ct. at 2472. *Accord, United States v. Mitchell*, 538 F.2d at 1233. Brookins' arrest for license violations and the inventory search of his Jaguar were valid.

### III. EXCEPTIONS TO THE EXCLUSIONARY RULE.

Brookins argues, second, that the police learned of the existence and identity of Holt through the illegal interrogation, and that Holt's testimony should have been excluded as the tainted fruit of this poisoned tree. We reject this contention on two grounds: (1) his testimony was attenuated from the illegal police conduct (Part IV *infra*) and (2) the witness would otherwise have been discovered through ordinary police investigation (Part V *infra*).

■ The exclusionary rule bars evidentiary "fruit" obtained "as a direct result" of an illegal search or an illegal coercive interrogation.[1] *Wong Sun v. United States*, 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963). *Accord, United States v. Cruz*, 581 F.2d 535, 537–38 (5th Cir. 1978) (en banc). Its bar only extends from the "tree" to the "fruit," however, if the fruit is sufficiently connected to the illegal tree:

We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*Wong Sun v. United States*, 371 U.S. at 487–88, 83 S.Ct. at 417, *quoting* R. Maguire, *Evidence of Guilt* 221 (1959).

■ One form of insufficient connection between fruit and tree occurs if physical evidence, a witness' testimony, or the accused's statement has an attenuated link to the illegally secured evidence. *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939); *United States v. Cruz*, 581 F.2d at 538. Another type of inadequate connection arises if the derivative evidence has an independent source from the illegally taken objects or statements. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920); *United States v. Houl-*

---

1. This opinion discusses only those custodial interrogations that are involuntary or fraudulently induced, not those that are voluntary but that are accomplished without proper *Miranda* warnings.

tin, 566 F.2d 1027, 1031 (5th Cir.), *cert. denied*, 439 U.S. 826, 99 S.Ct. 97, 58 L.Ed.2d 118 (1978). A third category of insufficient connection obtains if the derivative evidence, in this case Holt's testimony, would inevitably have been discovered during a police investigation without the aid of the illegally obtained evidence. We conclude that Holt's testimony was properly admitted under both the attenuation exception and the inevitable discovery exception to the exclusionary rule.[2]

## IV. HOLT'S IDENTITY WAS ATTENUATED FROM THE INTERROGATION.

■ The first basis for upholding the admission of Holt's testimony derives from *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). The Court held that the attenuated connection between an illegal search and a witness' testimony dissipated the taint of the illegality so as to render the testimony admissible. We believe that the attenuated connection between tree and fruit in that case requires, *a fortiori*, a finding of a broken connection here.

In *Ceccolini*, a police officer, Biro, improperly searched an envelope lying on a cash register drawer in a shop that he had entered to visit with an employee, Hennessey, and Biro discovered gambling slips in the envelope. He had not entered the shop or searched the envelope with the intent to look for gambling evidence or to locate a witness. He asked Hennessey to whom the envelope belonged, and she replied that it belonged to the shop owner, Ceccolini. Biro conveyed this information to an FBI agent, without telling him how it was obtained, and the agent interviewed Hennessey after

a four month delay. Hennessey agreed to assist his investigation, and testified against Ceccolini, who under oath had told a federal grand jury that he was not involved in gambling. Ceccolini was indicted for perjury, and moved to suppress Hennessey's testimony as the fruit of the illegal search. The Supreme Court reversed exclusion of her testimony because, although "the particular knowledge to which Hennessey testified at trial can be logically traced back to Biro's discovery of the policy slips," her testimony was attenuated from that illegal search. *Id.* at 280, 98 S.Ct. at 1062. The Court applied a test for admissibility that (1) assessed "the degree of free will exercised by the witness," *id.* at 276, 98 S.Ct. at 1060 and (2) balanced the social cost of "exclusion [that] would perpetually disable a witness from testifying about relevant and material facts" against the efficacy of exclusion in furthering the " 'deterrent purpose of the exclusionary rule,' " *id.* at 275, 277, 98 S.Ct. at 1060, 1061.

Both the voluntariness requirement and the greater social cost requirement are more readily satisfied if the challenged derivative evidence is testimony rather than physical evidence. *Id.* at 276–77, 278, 98 S.Ct. at 1060–1061.

[T]he degree of attenuation was . . . sufficient to dissipate the connection between the illegality and the testimony. The evidence indicates overwhelmingly that the testimony given by the witness was [1] an act of her own free will [a] in no way coerced or even induced by official authority as a result of Biro's discovery of the policy slips. [b] Nor were the slips themselves used in questioning Hennessey. [c] Substantial periods of time elapsed between the time of the

2. We have used the phrase "inevitable discovery exception" because that is the designation employed most frequently by other circuits and commentators. Although we employ their terminology, its application in this case involves a rather narrow construction of the exception. *Compare* Part V(A) *infra* with Part V(C) *infra*. Like other circuits that have adopted the rule, we do not require absolute inevitability of discovery but simply a reasonable probability that the evidence in question would

have been discovered other than by the tainted source. Unlike precedents from those circuits, the ruling in this case is based on two additional factors: first, that the prosecutor demonstrated that the leads, which made discovery inevitable, were possessed by the police and were being actively pursued by the police prior to the occurrence of the illegal police conduct; second, that the evidence in question was the voluntary testimony of a witness.

illegal search and the initial contact with the witness, on the one hand, and between the latter and the testimony at trial on the other. . . . [d] [B]oth the identity of Hennessey and her relationship with the respondent were well known to those investigating the case. There is, in addition, [e] not the slightest evidence to suggest that Biro entered the shop or picked up the envelope with the intent of finding tangible evidence bearing on an illicit gambling operation, much less . . . the intent of finding a willing and knowledgeable witness to testify against respondent. [2] Application of the exclusionary rule in this situation could not have the slightest deterrent effect on the behavior of an officer such as Biro. The cost of permanently silencing Hennessey is too great for an even-handed system of law enforcement to bear in order to secure such a speculative and very likely negligible deterrent effect.

*Id.* at 279–80, 98 S.Ct. at 1062.

The information about Holt gained in the interrogation of Brookins and the testimony given voluntarily by Holt is attenuated in much the same way as was the connection between the illegal search and the challenged testimony in *Ceccolini.* Holt's identity and testimony can be traced to Brookins' telephone list and the traffic citation[3] as well as to Brookins' disclosure during the interrogation, whereas Hennessey's testimony could be traced only to the information gained in Biro's search. (1) The voluntari-

ness of Holt's testimony is indicated by similar factors: (a) his testimony was "in no way coerced" in the *Ceccolini* sense, although it was partially induced by a grant of immunity; (b) no illegally seized evidence was used in questioning him about the Jaguar theft; (c) although very little time passed between the interrogation and Holt's arrest, the time factor may be of less significance because Holt was not present at the interrogation;[4] (d) Holt's identity and accomplice activities would have been discovered by the police in the routine investigation of the telephone list and the traffic citation, although his identity had not actually been reported back to the Mountain Brook Police when the police misconduct occurred; and (e) initially the police here were not guilty of an illegal search, arrest, or interrogation, but attempted illegally to use an interrogation purportedly about other criminals as a confession.[5] As the Court noted in *Ceccolini,* " 'The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give.' " *Id.* at 277, 98 S.Ct. at 1060 quoting *Smith v. United States,* 117 U.S.App.D.C. 1, 3, 324 F.2d 879, 881 (D.C.1963), *cert. denied,* 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964). (2) Balancing the social cost against the deter-

3. The subsequent discovery of Carlton Holt's identity and testimony from the telephone list and the traffic citation is discussed more fully in Part V(D).

4. As one indication of the voluntariness of the witness' testimony, *Ceccolini* recognizes that testimony obtained some time after the witness confronts official misconduct is more likely voluntary than testimony elicited at the same time that the witness confronts the misconduct. In *Ceccolini,* the witness, Hennessey, was present in the building when the officer found the gambling slips, but was only asked to testify some months later rather than being requested to testify by an officer clutching a handful of gambling slips. In the present case, the witness, Holt, was not present when the Mountain Brook Police interrogated Brookins and so was not coerced or influenced by the police miscon-

duct in falsely promising Brookins use immunity to give testimony that he would not have given if the police had not promised Brookins immunity.

5. Voluntariness for attenuation purposes also is indicated by "[p]roof that the witness would have come forward by his own volition, regardless of his identification by the illegal search" and by "evidence that the witness was completely uncooperative when originally discovered by the illegal search but later changed his attitude and supplied the necessary information." *United States v. Marder,* 474 F.2d 1192, 1196 (5th Cir. 1973). *Accord United States v. Houltin,* 566 F.2d at 1032. *See also United States v. Cruz,* 581 F.2d at 543. The second factor, although not the first, was true of Holt.

rent effect of exclusion leads ineluctably to the conclusion that Holt's testimony should be admitted, as discussed in Part V(C) *infra*. We conclude that, as in *Ceccolini*, the witness' testimony was attenuated from the police misconduct and was properly admitted at trial.

## V. HOLT'S IDENTITY WOULD OTHERWISE HAVE BEEN DISCOVERED.

### A. *The Inevitable Discovery Exception to the Exclusionary Rule.*

The second basis for sustaining the admission of Holt's testimony is a factually limited application of the inevitable discovery exception to the exclusionary rule. Note 2 *supra*. That exception, if unlimited, permits admission of derivative evidence that in fact resulted from the illegal search or interrogation but that would have been discovered without that illegal police action. In other words, the prosecution must show a reasonable probability that the police would have uncovered the derivative evidence apart from the illegal actions.

> [T]he exclusionary rule does not come into play merely because the proffered evidence is in fact the product of an illegal act. If . . . the illegal act merely contributed to the discovery of the allegedly tainted information and . . . such information would have been acquired lawfully even if the illegal act had never transpired, the presumptive taint is removed, and the apparently poisoned fruit is made whole. In other words, if . . . the illegal act was not an indispensable cause of the discovery of the proffered evidence, the exclusionary rule does not apply.

Maguire, *How to Unpoison the Fruit—The Fourth Amendment and the Exclusionary Rule*, 55 J.Crim.L., Criminology, and Police Sci. 307, 313 (1964). *Accord, United States*

*ex rel. Owens v. Twomey*, 508 F.2d 858, 865–66 (7th Cir. 1974).

The Supreme Court recently has suggested this exception to the exclusionary rule in *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). *See* Comment, 47 Cin.L.Rev. 487, 489 n.17 (1978). In that case, the police violated the right to counsel of an accused murderer by eliciting incriminatory statements and then the location of the victim's body after the accused had terminated interrogation until he reached his lawyer. The court sustained exclusion of the incriminatory statements themselves, but suggested that admission of the location and condition of the victim's body might be proper "on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited." *Id.* at 406 n.12, 97 S.Ct. at 1243.[6]

### B. *Fifth Circuit Precedent on Inevitable Discovery.*

Two decisions of this circuit have applied the principles on which this exception rests but in a slightly different context. In *Gissendanner v. Wainwright*, 482 F.2d 1293 (5th Cir. 1973), an illegally obtained confession provided the identities of two accused rapists and accounted for their presence in a lineup identification. The lineup and subsequent convictions were valid, however, because the rapists' identities would probably have been discovered subsequently during ordinary investigations.

> Certainly, before any consequences so destructive of society's right to be protected from violent crimes [are] to be set in motion, there would have to be a respectable showing that (i) it was *solely through such invalid source that identity was ascertained* and (ii) there was *no likelihood that it would have subsequently been discovered* through other police

---

**6.** Some circuits have anticipated, while others have embraced, the Supreme Court's recommendation of the inevitable discovery exception. *United States v. Schmidt*, 573 F.2d 1057, 1065–66 n.9 (9th Cir.), *cert. denied*, 439 U.S. 881, 99 S.Ct. 221, 58 L.Ed.2d 194 (1978); *United States ex rel. Owens v. Twomey*, 508 F.2d 858, 865–66 (7th Cir. 1974); *Virgin Islands v. Gereau*, 502 F.2d 914, 927–28 (3d Cir. 1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *Killough v. United States*, 119 U.S.App.D.C. 10, 15, 336 F.2d 929, 934 (D.C.Cir.1964).

efforts. In summary, there is no showing on this record . . . that in the normal police work investigation *their identities would not have turned up.*

*Id.* at 1297 (emphasis added). The court thus admitted evidentiary fruit that had a reasonable probability of subsequent discovery through "normal police work investigation." Although that evidence had been found in fact through the illegal source of an excluded confession, the illegally acquired evidence was not the indispensable source of the identification. Similarly, in *Harlow v. United States*, 301 F.2d 361 (5th Cir.), *cert. denied*, 371 U.S. 814, 83 S.Ct. 25, 9 L.Ed.2d 56 (1962), an illegal interception of mail contributed to the disclosure of McLane's identity and led to his interrogation about a bribery conspiracy. His ensuing confession and disclosures were the basis for a search warrant for incriminating letters implicating Harlow and Wilson. The confession and disclosures were not excluded, however, both because independent leads (the independent source rule) also led to the interrogation of McLane and because his confession and disclosures had a reasonable probability of occurrence otherwise (the inevitable discovery rule).

The investigating agents were not forever precluded from interrogating McLane and pressing him to confess merely because they thereafter illegally seized other evidence tending to implicate McLane in the bribery scheme. McLane did not indicate that he would not have confessed if he had not been told of the interception of Wilson's mail by the investigating agents. For all we know, *McLane would have told all regardless* of whether this information was imparted to him by the investigating agents. . . . McLane may well have been persuaded that the "jig was up" and that it would be best for him to make a full disclosure of his dealings with Harlow and Wilson. *We are unable to say, therefore, that the information received from McLane,* which led

to the search of Wilson's quarters, *was the ultimate product of the illegal interceptions of Wilson's mail.*

301 F.2d at 373 (emphasis added; footnote omitted).

Another panel of this circuit, however, expressly rejected the inevitable discovery rule in *United States v. Houltin*, 525 F.2d 943 (5th Cir. 1976).[7] Illegal interception of telephone conversations apprised Drug Enforcement Administration agents that the defendants were leaving in their aircraft from a New Mexico airport, and this information enabled an agent to follow their flight to Mexico and to apprehend them upon their return with a cargo of marijuana. The court rejected the government's argument that even without the illegally obtained information the agent investigating the defendants would have returned to the New Mexico airport, would have flown to Mexico on finding the defendants absent, and would have apprehended them on their return.

This argument is based on the "inevitable discovery" doctrine, which this circuit has unambiguously rejected. *Parker v. Estelle*, 5 Cir. 1974, 498 F.2d 625, 629–30 n.12, cert. denied, 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 [1975] . . . ; *United States v. Castellana*, 488 F.2d at 68.

525 F.2d at 949. The *Castellana* opinion cited by the Court in *Houltin*, however, was vacated upon the grant of rehearing en banc 500 F.2d 325 (5th Cir. 1974) (en banc) (finding no illegality occurred rendering suppression issue irrelevant). *Parker*, the other authority cited in *Houlton*, relied solely on that vacated *Castellana* opinion. In *Parker*, a panel of this court observed in dictum that the inevitable discovery rule "was rejected in *United States v. Castellana*, 488 F.2d 65, 68 (5th Cir. 1974); but *cf. Gissendanner v. Wainwright*, 482 F.2d 1293, 1297 (5th Cir. 1973)." *Parker v. Estelle*, 498

---

7. *Vacated on other grounds sub nom. Croucher v. United States*, 429 U.S. 1034, 97 S.Ct. 725, 50 L.Ed.2d 745 (1977), *modified on other grounds*, 553 F.2d 991 (5th Cir. 1977), *modified after* remand, 566 F.2d 1027 (5th Cir.), *cert. denied*, 439 U.S. 826, 99 S.Ct. 97, 58 L.Ed.2d 118 (1978).

F.2d at 629–30 n.12.[8] Examination of the cited authorities may call the correctness of *Houltin* into question but to the extent applicable it controls unless its current force has been influenced by subsequent holdings of the Supreme Court.

### C. Reasons for Application of the Inevitable Discovery Rule.

*Houltin* cannot be given binding effect with respect to the voluntary testimony of a witness who would have been discovered had the illegality not occurred through ordinary police investigations of lawfully obtained evidence. In this case, leads possessed and being pursued, by the police prior to the occurrence of the illegality would have inevitably led to the discovery of Holt. Supreme Court decisions subsequent to the conflicting decisions of this circuit have given strong support to the rationale for adoption of the inevitable discovery exception in *Gissendanner* and *Harlow* and have undercut the reasons for its rejection in *Houltin* and *Parker*. First, as we have described above, the Court recently suggested an unlimited inevitable discovery rationale for admitting tainted evidentiary fruit in *Brewer v. Williams*, 430 U.S. at 406 n.12, 97 S.Ct. at 1243.

Second, the Supreme Court dealt specifically with admissibility of testimony derived in fact from illegal police action in *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978).[9] The Court held that the attenuated connection between the illegal search and the testimony of a witness discovered through that illegal search rendered the testimony admissible. *Id.* at 279, 98 S.Ct. at 1061. In reaching its holding it drew a distinction which applies here.

> [W]e have declined to adopt a "*per se* or 'but for' rule" that would make inadmissible any evidence, whether tangible or live-witness testimony, · which somehow came to light through a chain of causation that began with an illegal arrest. *Brown v. Illinois*, 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975).

> . . . "The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give. . . ." *Smith v. United States*, . . . 117 U.S.App.D.C. 1, 4, 324 F.2d 879, 881 (D.C.Cir.1963), cert. denied, 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964) . . . .

*Id.* at 276, 277, 98 S.Ct. at 1060–1061.

Third, recent Supreme Court decisions reject earlier statements that portray the exclusion of illegally obtained evidence as constitutionally required and make clear that the exclusionary rule reduces to a "judicially created remedy" to be applied only when it advances its judicial purpose. *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974). *Accord, United States v. Ceccolini*, 435 U.S. at 275, 98 S.Ct. at 1059.[10] In the fourth

---

**8.** One other decision, *United States v. Resnick*, 483 F.2d 354 (5th Cir.), *cert. denied*, 414 U.S. 1008, 94 S.Ct. 370, 38 L.Ed.2d 246 (1973), has been cited as rejecting the inevitable discovery exception. *Resnick* relied on the independent source exception, 483 F.2d at 357, and did not reach any inevitable discovery issue.

**9.** Although the decision in *Ceccolini* rested on the attenuation exception to the exclusionary rule and did not reach the inevitable discovery holding of the lower court, 435 U.S. at 273, 98 S.Ct. at 1058, its analysis provides some support for the inevitable discovery exception. As the dissenting opinion observed,

> The Court would apparently first determine whether the evidence stemmed from an independent source *or would inevitably have been discovered*; if neither of these rules was found to apply, as here, the Court would still somehow take into account [as attenuation] the fact that . . . witnesses sometimes do come forward of their own volition.

*Id.* at 287–88, 98 S.Ct. at 1066 (Marshall, J., dissenting) (emphasis added).

**10.** *See also Stone v. Powell*, 428 U.S. 465, 482, 96 S.Ct. 3037, 3046, 49 L.Ed.2d 1067 (1976); *United States v. Janis*, 428 U.S. 433, 446, 96 S.Ct. 3021, 3028, 49 L.Ed.2d 1046 (1976); *United States v. Houltin*, 566 F.2d at 1030; *Sosa v. United States*, 550 F.2d 244, 249 (5th Cir. 1977).

amendment context, the "single and distinct" purpose for the exclusionary rule is deterrence of police violations of that constitutional protection against unreasonable searches and seizures. *Tehan v. United States ex rel. Shott*, 382 U.S. 406, 413, 86 S.Ct. 459, 463, 15 L.Ed.2d 453 (1966). *Accord, United States v. Janis*, 428 U.S. 433, 446, 96 S.Ct. 3021, 3028, 49 L.Ed.2d 1046 (1976).[11] In the fifth and sixth amendment context, the "prime purpose" of the exclusionary rule as applied to the fruits of police illegality is deterrence of government denial of the self-incrimination privilege or the counsel right, *United States v. Calandra*, 414 U.S. at 347, 94 S.Ct. at 619; *accord, United States v. Ceccolini*, 435 U.S. at 275, 98 S.Ct. at 1059, but a secondary purpose[12] is ensuring the trustworthiness of incriminating statements, *Michigan v. Tucker*, 417 U.S. 433, 446–47, 448, 94 S.Ct. 2357, 2364–2365, 2366, 41 L.Ed.2d 182 (1974); *see Brown v. Illinois*, 422 U.S. 590, 600–01, 95 S.Ct. 2254, 2260, 45 L.Ed.2d 416 (1975).[13] The attenuated connection exception and the independent source exception are justified because it is unlikely that suppression of attenuated or independently discovered derivative evidence would deter police misconduct and would bar untrustworthy evidence. *E. g., United States v. Ceccolini*, 435 U.S. at 280, 98 S.Ct. at 1062; *see United States v. Houltin*, 566 F.2d at 1030–31. This justification also applies to the inevitable discovery exception.

Deterrence is only marginally served by suppression of testimony derived from illegally obtained evidence if such testimony would have been discovered without the illegal actions, because the motivation for the illegal search or interrogation was not the quest for derivative evidence that the police were already pursuing and would probably have been discovered in any event.

The argument against exclusion becomes particularly forceful if the evidentiary fruit is testimony rather than physical evidence because, as the Supreme Court held in *Ceccolini*, "[t]he greater the willingness of the witness . . . freely [to] testify, the greater the likelihood that he or she will be discovered by legal means and, concomitantly, the smaller the incentive to conduct an illegal search to discover the witness." 435 U.S. at 276, 98 S.Ct. at 1060.

The trustworthiness purpose is served only slightly by exclusion of the inevitably discovered fruits of illegal searches or interrogations, because probable subsequent discovery of that same evidence ensures its trustworthiness and permits counsel for the government and for the accused to corroborate or disprove that derivative evidence.[14] The deterrent impact and trustworthiness effect from excluding inevitably discovered evidence must be balanced against the state interest in enforcing the criminal laws and protecting society from criminals. *Stone v. Powell*, 428 U.S. at 487, 96 S.Ct. at 3049; *United States v. Janis*, 428 U.S. at 453–54, 96 S.Ct. at 3031–3032. "[T]he application of the [exclusionary] rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *United States v. Calandra*, 414 U.S. at 348, 94 S.Ct. at 620. *Accord, Stone v. Powell*, 428 U.S. at 486–87,

---

**11.** *See also Stone v. Powell*, 428 U.S. at 486, 96 S.Ct. at 3048; *United States v. Cruz*, 581 F.2d 535, 538 n.1 (5th Cir. 1978) (en banc).

**12.** "Judicial integrity" is no longer regarded as an independent purpose or rationale for the exclusionary rule. *Michigan v. Tucker*, 417 U.S. 433, 450 n.25, 94 S.Ct. 2357, 2367, 41 L.Ed.2d 182 (1974).

**13.** *See also United States v. Houltin*, 566 F.2d at 1030; *Leary v. United States*, 544 F.2d 1266, 1270–71 (5th Cir. 1977).

**14.** This case parallels *Tucker*, in which the identity and location of a witness was disclosed by the accused in an interrogation without the full *Miranda* warnings. The Supreme Court there upheld admission of the witness' testimony because

> The evidence which the prosecution successfully sought to introduce was not a confession of guilt by respondent, . . . but rather the testimony of a third party who was subjected to no custodial pressures. There is plainly no reason to believe that [the witness'] testimony is untrustworthy simply because *respondent* was not advised of *his* right to appointed counsel.

*Michigan v. Tucker*, 417 U.S. at 449, 94 S.Ct. at 2366 (emphasis in original). The same considerations militate in favor of admitting Holt's testimony.

96 S.Ct. at 3048–3049.[15] The harms resulting from exclusion of relevant and reliable evidence that the prosecution would probably have had despite the police misconduct outweighs the slight deterrence and trustworthiness produced by suppression of inevitably discovered evidence.

 This approach does not mean that any illegally obtained evidence can be admitted simply because law enforcement officials assert that it would have been inevitably discovered. The mere assertion of inevitable discovery must fail. After the accused has challenged the legality of the witness' acquisition and of the use of the witness' testimony, the police must show that when the illegality occurred they possessed and were actively pursuing the evidence or leads that would have led to the discovery of the challenged witness and that there was a reasonable probability that that witness would have thereby been discovered. The prosecution must bear the burden of proof on this issue. Maguire, supra at 315; see Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The court then must find that reasonable probability of subsequent discovery existed based on this showing and the record generally. Our holding, therefore, is that, despite a prior illegality which led to the discovery of a witness, that witness' voluntary testimony is admissible if the prosecution proves that the witness and his testimony would have been discovered in a lawful manner, had the prior illegality not occurred, by virtue of ordinary investigations of evidence or leads already in their possession.

### D. The Probability of Holt's Discovery.

 The Mountain Brook Police saw the telephone list of Brookins' calls the day before the arrest, and they consequently knew about his conversation with someone at the house of M.D. Holt before the illegal interrogation. They had set in motion police inquiries in Nashville. The Mountain Brook Police properly possessed the traffic citation that they had found in the inventory search of the Jaguar after Brookins' arrest, Part II supra. Before the illegal interrogation the Nashville investigation had led them to contact David L. Hurst, the recipient of the citation, a friend with whom Brookins frequently had stayed in Nashville. More than a reasonable probability existed that normal police investigation, if the interrogation had never occurred, would have disclosed the identity of Carlton Holt,[16] which would have led to knowledge of his involvement in the automobile theft. The record reflects that the Nashville investigations actually did yield

---

15. See also United States v. Cruz, 581 F.2d at 538 & n.1; United States v. Houltin, 566 F.2d at 1032–33.

16. The inevitability of discovery of Carlton Holt's identity and testimony is evident from the following and other testimony of Officer Watkins and Lt. Littlefield of the Mountain Brook police.

> THE COURT: How did it lead to Mr. Holt?
> MR. WATSON: They interviewed—judge, I don't have right in front of me the exact procedure that led to Mr. Holt. They interviewed the mother and an individual by the name of Mr. Hurst, and I am not really positive exactly, you know, where [Carlton] Holt's name came up during the investigation. I know that the agent [in Nashville] called me and said that he had run across Mr. Holt through his investigation.
> THE COURT: Have you got something to add?
> LIEUTENANT LITTLEFIELD: Yes, sir. In addition to that, when we checked at the motel for the registration to see who, if Mr.

> Brookins was registered at the motel, our officers looked at the motel bill which had their long distance phone bills with it, and Mr. Holt's phone number was there also. He had been called, [Brookins] had called that number while he was registered at the motel before he was arrested, and before we arrested him in September, I mean, in November, excuse me.
>
> . . . . .
>
> LIEUTENANT LITTLEFIELD: But, I believe also what Mr. Watson was talking about, I believe the car that he got the [traffic] ticket in in Irondale, I believe it was registered to a Mr. Hurst. I believe it was after the interview [in Nashville] of Mr. Hurst that they got Mr. Holt's name there a second time. I am not positive on that, but, I believe that's the way it was.

The Mountain Brook police sent "leads" from the telephone number list and traffic citation to the Nashville law enforcement authorities before the excluded interrogation at which Brookins disclosed Carlton Holt's name, although

Mr. Holt's name. There is no question that Brookins' own statements in the interrogation must be excluded from his trial, as the district court recognized. *See United States v. Del Soccorro Castro*, 573 F.2d 213 (5th Cir. 1978) (excluding statements in interrogation without *Miranda* warnings). *Cf. Michigan v. Tucker*, 417 U.S. at 449, 94 S.Ct. at 2366 (excluding some statements, although not their fruit, taken in violation of *Miranda* rule). Exclusion of illegally acquired evidence, however, "does not mean that the facts thus obtained become sacred and inaccessible." *Silverthorne Lumber Co. v. United States*, 251 U.S. at 392, 40 S.Ct. at 183. *Accord, United States v. Ceccolini*, 435 U.S. at 274, 98 S.Ct. at 1059. The fruit of those statements, Holt's testimony, which would otherwise have inevitably been discovered, need not be suppressed.

AFFIRMED.

R. LANIER ANDERSON, III, Circuit Judge, concurring in part:

I concur in the result and in all of the opinion except the alternate ground for the decision expressed in part IV of the opinion.

the police did not receive that name and information about Holt's collaboration with Brookins' thefts until *after* that interrogation. The police would have discovered the name and testimony of Carlton Holt in the course of ordinary investigation under the circumstances of this case.